STATE of Minnesota, Respondent,

v.

Nicole Marie BEECROFT,
Appellant (A09–0390),

and

Nicole Marie Beecroft, petitioner,
Appellant,

v.

State of Minnesota, Respondent
(A10–1604).

Nos. A09–0390, A10–1604.

Supreme Court of Minnesota.

May 23, 2012.

Lori Swanson, Minnesota Attorney General, Kimberly R. Parker, Assistant Attorney General, Saint Paul, MN and Peter Orput, Washington County Attorney, Stillwater, MN, for respondent.

John M. Stuart, Minnesota State Public Defender, Sara L. Martin, Assistant State Public Defender, Saint Paul, MN, for appellant.

Julie Ann Jonas, Innocence Project of Minnesota, Saint Paul, MN; and David F. Herr, Maslon Edelman Borman & Brand, LLP, Minneapolis, MN, for Amicus Curiae Innocence Project of Minnesota.

## OPINION

ANDERSON, PAUL H., Justice.

Nicole Marie Beecroft was found guilty of first-degree premeditated murder under Minn.Stat. § 609.185(a)(1) (2010), for the stabbing death of her newborn baby. The Washington County District Court convicted Beecroft of this offense and sentenced Beecroft, who was 17 years old and 9 months of age at the time of her baby's death, to life imprisonment without the possibility of release. Beecroft filed a direct appeal, but that appeal was stayed in order for Beecroft to file a petition for postconviction relief. After an evidentiary hearing, the postconviction court denied Beecroft's petition. Beecroft alleges in her consolidated direct and postconviction appeal that (1) the State deprived her of her due process right to present a complete defense, (2) she was denied effective assistance of counsel, and (3) the district court erred when it violated her rights under *Miranda v. Arizona* by admitting a statement she made to the police. In the alternative, Beecroft argues that we should reverse her conviction in the interests of justice.

The key factual issue at trial was whether Beecroft's baby was alive or dead when stabbed by Beecroft. Each party presented testimony on this issue from medical examiners and other forensic pathologists; but, certain state officials interfered with Beecroft's forensic experts, which interference undermined the integrity of the judicial system in this case. While the trial errors alleged by Beecroft may not in and of themselves warrant a reversal and the grant of a new trial, we conclude that, when the existence of the alleged errors is combined with the improper conduct of certain state officials, a reversal is warranted in the interests of justice. Therefore, we reverse Beecroft's conviction and remand for a new trial.

On April 10, 2007, the Saint Paul and Oakdale police departments investigated an anonymous tip that led the police to believe that appellant Nicole Marie Beecroft had given birth to a stillborn baby and then placed the baby's body in the trash. As part of their investigation, the police went to the house in Oakdale where Beecroft lived with her mother. At Beecroft's home, the police observed evidence that Beecroft may have been bleeding, but they did not find a baby. The police then went to Beecroft's workplace where she apparently had just finished her shift. After being confronted by the police, Beecroft agreed to ride in a squad car to the police station to answer questions.

## Beecroft's Statements to the Police

Once at the police station, the police gave Beecroft a *Miranda* warning. Beecroft told the police she understood her rights and wanted to talk to the police. Beecroft's mother, who had gone to the police station of her own accord, was present when the *Miranda* warning was given and when Beecroft was questioned. Beecroft explained to the police that she first suspected that she might be pregnant in July 2006. She admitted taking a pregnancy test in February 2007 and that the test was positive. Beecroft then told the police that she gave birth to a baby girl on the concrete laundry-room floor of her home at approximately 3:00 a.m. on April 9, 2007. Beecroft said she was scared when the baby was born and she lay with the baby for at least 10 minutes. According to Beecroft, the baby was not breathing, did not move, and was "[p]ale white." Beecroft also told the police that the baby's eyes were closed and that she did not attempt to give the baby CPR or clear the baby's airway, but Beecroft did flick the baby's feet to see if the baby would respond. Beecroft said that "it did not breath[e], it did not move, it didn't do anything, it just laid there, like a Barbie or doll." When asked whether she had looked closely at the baby, Beecroft responded that she never turned on the light to look at the baby because she did not want to see a dead baby. Beecroft said she eventually wrapped the baby's body in a towel and put the baby in a garbage can outside her home.

During the police interview, Beecroft said that if the baby had been breathing, she would have taken the baby to a hospital and put the baby up for adoption. Beecroft said she did not name the baby. Beecroft also explained that the only person she told about her pregnancy until the birth was her friend, E.M. Beecroft did not tell her mother about the pregnancy or the birth.

Toward the end of interview, the police asked Beecroft if she had "heard of words on TV like homicide and murder." The police then told Beecroft that they were "going to find out the truth," that the facts would "play out," and that an autopsy would show if she was lying. Beecroft insisted that she was telling the truth. Beecroft eventually started crying and said, "[Y]ou guys are accusing me of it! I did not kill it!" At about this point, Beecroft's mother stopped the interview. The police station interview was about 50–minutes long. Beecroft was not arrested after this interview and was permitted to leave the station with her mother. Beecroft then went with her mother to a hospital for treatment of postpartum bleeding and cramping.

Meanwhile, the police obtained a search warrant for Beecroft's home. The police discovered the baby's body inside a trash-can next to the home. The body, wrapped in a towel saturated with blood, was inside a brown paper bag that was inside a black plastic garbage bag. The police observed "what appeared to be wounds" on the baby's body, and found a bloody knife in the bag with the body. Investigators also summoned personnel from the Ramsey County Medical Examiner's office to the scene. Later that day, Dr. Kelly Mills, an Assistant Ramsey County Medical Examiner, conducted an autopsy on the baby's body at her office with the police present. Dr. Mills reported that the baby was alive at the time of birth and that there were more than 100 stab wounds on the baby's body.

The next morning, April 11, three police officers questioned Beecroft in her hospital room. Beecroft's mother was also present during this interview. The police again gave Beecroft a *Miranda* warning and

Beecroft affirmed that she understood her *Miranda* rights. But the police did not warn Beecroft that she could be charged as an adult and, in contrast to the interview the night before, the police did not ask Beecroft whether she wished to speak to them before beginning the questioning.

During the hospital interview, the police started their questioning by asking essentially the same questions they had asked during the first interview. Beecroft responded by expanding on the information that she gave the police the previous day. Approximately 9 minutes into the interview, the police told Beecroft they had found the baby's body in a garbage bag at her home. When Beecroft's mother expressed disbelief, the police repeated the information and told Beecroft that the baby's body displayed "[a] lot of injuries." The police continued their questioning by stating: "[W]e understand that people make mistakes and ... this is an extremely hard time for you. But, ... we need the honest truth." Beecroft then started to cry and told police, "I went into panic mode and I stabbed her." When the police asked whether the baby was moving, Beecroft responded, "Just her finger. That's the only thing I saw move but I went into panic mode." Beecroft's mother then stopped the interview.

A Washington County grand jury indicted Beecroft for premeditated first-degree murder. *See* Minn.Stat. § 609.185(a)(1) (2010). Beecroft pleaded not guilty and moved to suppress the statement she made to the police at the hospital. At the suppression hearing, the State presented evidence consistent with the facts outlined above. The district court denied the motion to suppress, explaining that Beecroft was not in custody during the hospital interview and that even if she was in custody, the police gave Beecroft an adequate *Miranda* warning and Beecroft voluntarily waived her *Miranda* rights.

The district court made specific findings supporting its conclusion that Beecroft was not in custody when the police questioned her at the hospital. Specifically, the court found that Beecroft was "allowed to leave the police department the night before" the police questioned her at the hospital, that Beecroft "was well enough to be leaving the hospital" when the challenged statement was taken, and that the police "wanted to get more information" but did not approach Beecroft "with the intention to arrest or knowing anything in particular" about what Beecroft would say.

With respect to the adequacy of the *Miranda* warning, the district court found that Beecroft was young, "but not as young as some Defendants ... that are analyzed in the case law." The court found that Beecroft was 17 years and 9 months old at the time of the hospital interview, she "had her mother present," she or her mother had directed the police at some point to stop the questioning, and she had received the *Miranda* warning "twice in less than 24 hours." With respect to waiver, the court found that Beecroft did not give any indication that she was not willing to talk and that Beecroft's behavior did not indicate that she did not want to answer questions. Further, the court found that these facts, together with the fact that Beecroft did not hesitate or resist answering questions, all supported the conclusion that Beecroft adequately waived her rights.

*Trial*

Beecroft waived her right to a jury and elected to try her case to the district court. The most important factual issue at trial was whether the baby was alive or dead when Beecroft stabbed her. Although the court sequestered the trial witnesses, the court allowed each party to have one con-

sulting expert present in the courtroom during testimony by the opposing party's experts.

The State introduced into evidence Beecroft's statement to the police in which she admitted stabbing the baby and putting the baby in the trash after seeing the baby's finger move. A jail official testified that he overheard Beecroft tell her mother that the baby's "fingers were moving." Beecroft's friend, E.M., testified that Beecroft told her that the baby's eyes were "half open," and that Beecroft wanted to name the baby "Nevaeh" because it is "heaven" spelled backward.

The State also presented expert testimony corroborating Beecroft's statements to the police and her mother indicating that the baby was born alive. Dr. Mills testified about her autopsy findings, explaining that the baby had been stabbed more than 100 times, was a "viable female infant," and "was indeed born alive." Dr. Mills based her conclusions on the gestational age of the baby; the appearance of contusions on the baby's body; air in the baby's lungs and stomach; aeration, hemorrhaging, and inflammation in the baby's lungs; and hemorrhaging and inflammation in the baby's esophagus.

Dr. Daniel Davis, the Oregon Deputy State Medical Examiner, also testified for the State. Dr. Davis stated that he had conducted a review of the State's medical evidence. He testified that the cause of death was "multiple sharp-force injuries" and the manner of death was homicide. Dr. Davis concluded that the baby was born viable based on the fact that the baby was full term, did not have any abnormalities or conditions indicating that she died in utero, did not have the appearance of a baby that had been dead for any length of time in utero, had "injury-related hemorrhage," had inflated lungs, had air in the stomach, and had trauma indicating a beating heart.

The State also presented the following evidence on the issues of premeditation, intent, and motive. There was evidence that Beecroft tried to hide her pregnancy from her family and others, except her friend, E.M. Beecroft indicated a desire to end the pregnancy and did not make any preparations for the child's birth. A worker at LifeCare Center East, which is a nonprofit pregnancy resource center, testified that on September 5, 2006, Beecroft took a pregnancy test at the Center that showed a positive result. The worker testified that Beecroft was considering an abortion, was not "responsive," left the clinic still "abortion-minded," and did not show up for a scheduled ultrasound appointment. Further evidence was presented showing that on multiple occasions Beecroft discussed with E.M. the possibility of getting an abortion; but, because Beecroft was under the impression that as a minor she needed court approval or parental consent to get an abortion, she did not seek one.

The State connected Beecroft to the crime by presenting several items of physical evidence. DNA in blood found in several rooms of Beecroft's home was consistent with Beecroft's DNA. The knife in the bag with the baby's body matched a steak knife found in the kitchen and DNA found on the knife in the bag was consistent with that of the baby. The baby's DNA could not be excluded as a contributor to blood samples taken from a light switch in the family room. The baby's DNA was found on a dishtowel. Beecroft's DNA was found in a mixture of blood on two pair of scissors and the baby could not be excluded as a contributor to the mixture of blood on either pair of scissors. DNA evidence also indicated that Beecroft was the baby's mother.

Dr. Michael McGee, the medical examiner for at least 14 Minnesota counties, including Ramsey and Washington Counties, and Dr. Rebecca Baergen, the Chief of Perinatal and Pediatric Pathology at Cornell Medical College, testified as the State's rebuttal witnesses. Both Dr. McGee and Dr. Baergen concluded that Beecroft's baby was born alive and died from loss of blood.

Beecroft called only two witnesses—Dr. Janice Amatuzio and Dr. Charles Wetli. Dr. Amatuzio is the medical examiner for nine Minnesota counties, including Anoka County. Dr. Wetli is the former Chief Medical Examiner for Suffolk County, New York.

Dr. Amatuzio testified that, in her opinion, Beecroft's baby was not alive when she was stabbed. But Dr. Amatuzio could not determine whether the baby was stillborn or born alive. Dr. Amatuzio agreed with the State's experts that the baby had what appeared to be hemorrhaging and air in her lungs when she died; but Dr. Amatuzio concluded that the baby was not breathing and the baby's heart was not beating when she was stabbed. Dr. Amatuzio concluded that air got into the baby's lungs by way of a "bellows" effect when the baby was stabbed, and not by the baby taking a breath.

Based on his review of the autopsy and other evidence, Dr. Wetli testified that the baby was not alive when Beecroft stabbed her. In particular, Dr. Wetli concluded that the lack of blood in any of the baby's airways or internal organs indicated that the baby's heart was not beating when the baby was stabbed. Dr. Wetli also disagreed with the opinions of the State's experts with respect to the evidence of air in the baby's lungs.

*Interference with Medical Examiners*

The record indicates that interference occurred with respect to forensic experts who were consulting with or planning to testify on behalf of Beecroft. In March 2008 the defense requested an expert opinion from Dr. Susan Roe, an assistant medical examiner for eight Minnesota counties, including Dakota County. The defense specifically asked Dr. Roe to render an expert opinion with respect to Dr. Mills's autopsy report.

In the course of reviewing Dr. Mills's autopsy report, Dr. Roe consulted with her mentor, Dr. Janice Ophoven. Dr. Ophoven is a forensic pathologist who works as an Assistant Saint Louis County Medical Examiner and owns her own clinical pediatric forensic pathology company. In particular, Dr. Ophoven's professional background is in "forensic pathology with special training and experience in the evaluation, investigation and interpretation of injuries and fatalities in childhood." On April 8, 2008, Dr. Ophoven provided a formal report to Dr. Roe regarding the circumstances of the death of Beecroft's baby. In preparing the report, Dr. Ophoven reviewed medical records, police records, and Dr. Mills's autopsy report. In her report, Dr. Ophoven concluded, "There is no evidence in this case to verify that baby girl Beecroft was in fact born alive. The evidence is much more consistent with a stillbirth." Dr. Ophoven based her conclusion on the general lack of alveolar expansion in the baby's lungs.[1] Further, Dr. Ophoven "strongly disagree[d]" with Dr. Mills's conclusions regarding air in the lungs.

1. Pulmonary alveoli are microscopic air cells of the lung. 1 J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* A–138 (1981) The alveoli of the lung are tiny "sacs" or "chambers," through which the air within the lung passes oxygen into the blood of the lung, and the blood passes carbon dioxide into the air. *Id.*

Dr. Ophoven also reviewed her report with Beecroft's defense counsel; but, when doing so, Dr. Ophoven made clear that she could not testify as a defense witness in the case. Dr. Ophoven indicated that as a result of the terms of her employment as an Assistant Saint Louis County Medical Examiner, she "was not available nor would [she] be willing to provide any testimony." Dr. Ophoven subsequently told counsel that since 2003 she has subcontracted with Saint Louis County to perform medical examiner services on a part-time, at-will basis. More specifically, Dr. Ophoven said that she has an employment agreement with Dr. Thomas Uncini, owner of Lakeland Pathology, who in turn contracts with Saint Louis County to perform services as that county's Chief Medical Examiner. Beginning in September 2007 Dr. Ophoven's employment agreement with Dr. Uncini prohibited her from testifying as a defense witness in any criminal case in Minnesota.

On April 17, 2008, Dr. Roe sent defense counsel a report outlining her own expert opinion. Dr. Roe explained, "[I]t is my opinion that Baby Girl Beecroft was a viable infant. I am unable to reliably determine stillbirth versus live birth. If I were signing the death certificate in this case, I would call both the cause of death and the manner of death 'undetermined.' "

After receiving Dr. Roe's report, Beecroft notified the State, in accordance with Minn. R.Crim. P. 9.02, that she intended to call Drs. Amatuzio, Roe, and Wetli as expert witnesses. Beecroft did not list Dr. Ophoven as a potential expert witness.

In September 2008, about 7 weeks before the beginning of Beecroft's trial, someone at the Nicollet County Attorney's Office emailed Dakota County Attorney James Backstrom, inquiring about the work of Dr. Roe. The author of the email believed that Dr. Roe was listed as a potential defense witness in a separate, unrelated Nicollet County child-suffocation case. On September 16, 2008, Backstrom emailed Dr. Roe's superior, Chief Dakota County Medical Examiner Dr. Lindsey Thomas, expressing his concerns about medical examiners testifying as defense witnesses. Backstrom's email to Dr. Thomas stated that he was "disturbed" that Dr. Roe was testifying as a defense expert in criminal cases and went on to explain his view that medical examiners testifying for defendants put him "in a difficult position" and created a "conflict of interest." Backstrom also expressed his concern that the defense bar might use transcripts of a medical examiner's defense-witness testimony to undermine the State in unrelated future prosecutions.[2]

2. Backstrom's September 16, 2008, email read as follows:

I recently received the email below from my colleague in Nicollet County inquiring about the work of Dr. Susan Roe who is apparently testifying as a defense expert in one of his cases. I am disturbed that a Deputy County Coroner in our community is testifying as a defense expert in prosecutions. Even when this occurs in other states, it puts me in a difficult position and this is even more true here in Minnesota. My colleagues ask us to share information regarding the work of defense experts all the time. Transcripts from expert testimony is also shared by defense attorneys

across our state and nation. The testimony of you or your assistants as defense experts in cases could not only be detrimental to the prosecution of the case in question, it could possibly have detrimental impact on prosecutions in this community based upon what might be said. I believe that the added credibility attached to someone who is currently a coroner/medical examiner in another community who testifies as a defense expert makes any prosecution more difficult.

From my perspective this is a conflict of interest. It would be no different from me testifying in another jurisdiction's prosecution that I disagreed with the prosecutor's

Dr. Thomas responded to Backstrom's email on September 16. Dr. Thomas clarified that Dr. Roe was not a consulting expert in the Nicollet County case. But Dr. Thomas stated that forensic pathologists "do consult with defense attorneys" and "[i]n the rare occasions that we do testify, we do so NOT as another county's medical examiner, but as a hospital-employed forensic pathologist." Dr. Thomas went on to state that she believed it would be a conflict of interest only if a medical examiner testified for the defense in one of her appointed counties.

In October 2008 the State provided Beecroft with several documents pursuant to the rules governing pretrial discovery. The documents included a transcript of Dr. Roe's testimony as a State's witness in a Wisconsin case and several of Dr. Roe's prior autopsy reports. Because Dr. Roe's prior testimony and autopsy reports expressed opinions that were inconsistent with Dr. Roe's opinion in Beecroft's case, the State informed Beecroft that the State intended to use the documents to impeach Dr. Roe if she were to testify at Beecroft's trial.

Sometime around the start of Beecroft's trial, Backstrom received a copy of an email from Assistant Washington County Attorney Richard Hodsdon. Hodsdon, acting in his capacity as counsel for the Minnesota Sheriffs' Association, had sent the following email to all the sheriffs in Minnesota: [3]

> I have been contacted by a few law enforcement people in a quiet ... way [who] have heard [a] rumor that Washington County may be the venue of a dispute between a few medical examiners....
>
> The County [A]ttorney is currently prosecuting a baby murder case in which the ME for Washington [and] Ramsey County, Dr. McGee, [who] has been the ME for the County for a very long time will testify that the baby was born alive and stabbed to death with over 100 stab wounds. The ME['s] office for two different counties have been disclosed and are scheduled to testify as defense witnesses to contradict the county's ME. I will leave it at that at this point.

When Backstrom learned of Hodsdon's email, he forwarded it to Dr. Thomas. In his email, Backstrom renewed the concerns he had articulated in his September email. He emphasized that he did not find it acceptable that either Dr. Thomas or members of her staff were accepting requests to testify as a defense witness and that if Dr. Thomas or members of her staff continued to accept such requests, Backstrom would not be in a position to contin-

interpretation of the facts in a case and would have done things differently. While my testimony to that effect would be inadmissible under court rules, conflicting opinions of a coroner/medical examiner is not. I understand the argument that your job is to pursue the truth. I have the exact same responsibility to pursue the truth as a minister of justice. It is not my or your responsibility, however, to do so outside of the jurisdiction where we work. Even if my testimony as an expert witness for the defense in another jurisdiction's prosecution were admissible, I can tell you that I would not do it.

For your information, I informed the Nicollet County Attorney that we have respect for the work of Dr. Roe.... I did, however, tell him that I would express my concerns about this to you and asked him to advise me of any concerns/issues he has with Dr. Roe's opinions/testimony.

3. Hodsdon served as an Assistant Washington County Attorney, but the record indicates that Hodsdon sent this email only in his capacity as counsel for the Minnesota Sheriffs' Association.

ue to support Thomas's appointment as the Dakota County Coroner.[4] Dr. Thomas responded to Backstrom's email by suggesting that she and Backstrom "meet for breakfast, coffee or lunch and we can talk about your concerns." Dr. Thomas argued that such a meeting was preferable to "exchanging increasingly hostile and threatening emails."

On November 10, 2008, 5 days into the trial, Beecroft called Dr. Amatuzio to testify as an expert witness. Dr. Amatuzio testified but specifically did not testify in her official capacity as the Anoka County Medical Examiner. Rather, before giving her opinion on the evidence, Dr. Amatuzio stated that she was testifying for the defense as a private physician. According to Dr. Amatuzio, someone from the Washington County Attorney's Office—the same office that was prosecuting Beecroft—contacted the Anoka County Attorney's Office and stated that it would be a "conflict of interest" for Dr. Amatuzio to testify as a defense witness for Beecroft. Dr. Amatuzio explained at trial that representatives from the Anoka County Attorney's Office then approached her and advised her to testify as a private physician rather than in her capacity as the Anoka County Medical Examiner.

After Dr. Amatuzio completed her testimony on November 10, defense counsel informed the district court that Beecroft no longer intended to call Dr. Roe as a witness. Defense counsel explained that they had learned of the ongoing conflict-of-interest debate between Backstrom and Dr. Thomas, and that based on that ongoing debate, they concluded that it would be inappropriate to put Dr. Roe in an "unten-

---

4. Backstrom's November 5, 2008, email read as follows:

I once again have received information about the testimony of you or a member of your office as a defense expert in a prosecution being conducted by one of my colleagues. I do not find this acceptable, particularly where the testimony being offered is in direct contradiction of the Ramsey County Medical Examiner (as is the case in the Washington County murder prosecution currently underway).... By undermining the credibility of Dr. McGee, you are directly and adversely impacting the work of my Office. As I previously told you in my earlier email below relating to the Nicollet County case, I view this practice as a conflict of interest and inappropriate. The testimony of you or your assistants as defense experts in cases could not only be detrimental to the prosecution of the case in question, it could possibly have detrimental impact on prosecutions in this community based upon what might be said. And when you attack the findings of a medical examiner's office I directly deal with on a routine basis and upon whom I rely with great confidence all the time, you are adversely impacting my work as Dakota County Attorney.

I do not accept your position that there is nothing wrong with this practice, nor does Dakota County Sheriff Don Gudmundson, who I have discussed this matter with. I strongly suspect that Dakota County's police chiefs would have a similar view of this issue. If you wish to be a defense expert, you should not be a public official representing Dakota County as our coroner. You are under no obligation to accept requests to testify as a defense expert—there are many other forensic experts out there who do not have the added credibility of being a sitting medical examiner in another jurisdiction who can assist in the criminal defense of persons charged with a crime. Refer these requests to them.

As I mentioned to you previously, this is no different than me expressing my opinion that a crime charged by the Ramsey County Attorney (for example) was inappropriate based upon my review of all of the facts and circumstances of the case.... In fact, I would never accept a request to review the matter in the first place. Nor do you have to accept these requests. If you continue to do so, I am giving you the courtesy of letting you know that neither the Sheriff or I will be in a position to continue to support your appointment as the Dakota County Coroner.

able position" by calling her as a witness. Specifically, defense counsel presented to the court a record of the emails between Backstrom and Dr. Thomas and explained that Dr. Roe had conveyed to defense counsel a "good faith concern about ... her continued employment" if she testified on behalf of Beecroft. Defense counsel also explained that their decision not to call Dr. Roe partially reflected their own assessment of the case. At that time, defense counsel did not ask the court to grant any specific relief based on the emails they had presented. When the court asked if the State had any comments, the prosecutor replied, "I don't think I can comment, Your Honor. It's all outside of my knowledge and my involvement."

Two days later, on November 12, Backstrom sent an email to Dr. Thomas and Dr. Roe, which email he then forwarded to the district court and defense counsel. In the email, Backstrom sought to "clarify [his] position" with respect to the conflict-of-interest debate. Backstrom explained that he assumed Dr. Roe would testify in Beecroft's trial and that it was "not [his] intent to stop her from doing so or to influence or affect her testimony in th[e] case in any respect."

Upon receiving Backstrom's email, defense counsel filed a motion with the district court, arguing that Backstrom had engaged in improper ex parte communications with the court. Beecroft's motion requested (1) an opportunity to make a further record of Backstrom's "continuing and inappropriate communications," (2) an order directing that the emails be made part of the official court record, and (3) any other appropriate relief. The parties and the court discussed Beecroft's motion on November 14, 2008. The court, stating

that it was "frankly flummoxed" by Backstrom's email to the court, allowed Beecroft to "make a record" concerning Backstrom's emails and agreed to make the emails part of the trial record.

Defense counsel asserted that, "based on the fact that [Dr. Roe] was the secondary recipient of ... coercive statements by ... Backstrom, ... Dr. Roe elected to, for all intensive [sic] purposes, completely sever her ties and communication with [defense counsel] regarding continued consultation on this particular case." According to defense counsel, Dr. Roe, after learning of Backstrom's November 5 email to Dr. Thomas, notified counsel that in the interest of her "financial self-preservation, she wanted no further involvement with ... the case." This meant that even though Dr. Roe was present in the courtroom to consult with defense counsel during the testimony of the State's experts Dr. Mills and Dr. Davis, Dr. Roe was not present during the testimony of defense witness Dr. Amatuzio and State rebuttal witness Dr. McGee.[5]

Based on Dr. Roe's absence, Beecroft requested a modification of the district court's sequestration order prohibiting the parties' experts from consulting with each other so that defense expert Dr. Wetli could speak with Dr. Amatuzio before Dr. Wetli testified. Beecroft argued that the modification was necessary because, as the court recognized, Dr. Roe had not been available to help defense counsel "digest [Dr.] Amatuzio's testimony" and thereby help defense counsel prepare Dr. Wetli. The court expressed concerns that the emails might have helped to deprive Beecroft "of the opportunity of having the same expert be [her] consulting expert throughout this case." Nevertheless, the court

---

5. To accommodate scheduling conflicts, the court allowed the State to present expert re-buttal testimony from Dr. McGee before Beecroft rested her case.

denied Beecroft's motion to modify the sequestration order because the court was not persuaded that allowing Dr. Wetli to speak with Dr. Amatuzio would provide a benefit to Beecroft that would outweigh the policies behind the court's sequestration order. But, the court did allow defense counsel to provide Dr. Wetli with a transcript of Dr. McGee's rebuttal testimony. Beecroft did not request a mistrial or seek any other relief at that time.

After Dr. Roe severed her ties with the defense, defense counsel asked Dr. Ophoven to serve as a defense consultant in lieu of Dr. Roe. Dr. Ophoven reluctantly agreed. But Beecroft did not attempt to call Dr. Roe or Dr. Ophoven to testify.

Following trial, the district court issued its written findings of fact, conclusions of law, and verdict. The court found Beecroft guilty of the first-degree premeditated murder of her baby in violation of Minn. Stat. § 609.185(a)(1). The court then convicted Beecroft of this offense and sentenced her to life in prison without the possibility of release.

*Postconviction Proceedings*

Beecroft initially filed a direct appeal, but her direct appeal was stayed so that she could pursue postconviction relief. In her petition for postconviction relief, Beecroft claimed for the first time that she was deprived of her due process right to present a complete defense. In the alternative, Beecroft argued in a posthearing memorandum that if the postconviction court concluded that she waived her due process claim, she was still entitled to a new trial because defense counsel's failure to assert the due process claim would constitute ineffective assistance of counsel.

The postconviction court granted Beecroft an evidentiary hearing.[6] At the hearing, defense counsel testified that it was

Dr. Roe's report that was the basis for them to consider for the first time whether the baby was alive or dead when Beecroft stabbed her, a consideration which later formed the theory of their case. Defense counsel further testified that although they were aware that Dr. Ophoven's report was favorable to Beecroft's defense, they never planned to call Dr. Ophoven because it was their understanding that she was barred from testifying for criminal defendants in the State of Minnesota. Defense counsel asserted that because of Dr. Ophoven's specialized knowledge related to the deaths and injuries of children, they would have called her as a witness if she had been available to testify.

Beecroft also presented the following evidence with respect to Dr. Ophoven's employment restriction. In September 2007 several Saint Louis County officials met to discuss their concerns about Dr. Ophoven's participation in an unrelated child-protection case, in which Dr. Ophoven's conclusions differed from the conclusions of the State's experts. Participants in the meeting were the Saint Louis County Attorney, the Saint Louis County Sheriff, two Assistant Saint Louis County Attorneys, and Dr. Uncini. Shortly after the meeting, Dr. Uncini wrote a letter to Dr. Ophoven requesting her to "perform no criminal defense work in the State of Minnesota while employed as an Assistant Saint Louis County Medical Examiner." Dr. Ophoven interpreted the letter to mean that she would be fired if she provided sworn testimony for any criminal defendant in Minnesota. Dr. Uncini testified that the restriction was essentially a condition of Dr. Ophoven's employment, and Dr. Ophoven agreed with this statement.

The postconviction court denied Beecroft's petition for postconviction relief.

6. The same judge presided over the court trial and postconviction proceedings.

The court found that there was no due process violation because Dr. Uncini, a private pathologist, was not a "state actor" and there was "no governmental intimidation of Dr. Ophoven," no structural defect, and no prejudice. The court also rejected Beecroft's ineffective assistance of counsel claim. The court explained that Beecroft failed to demonstrate that defense counsel's conduct fell below an objective standard of reasonableness because the evidence produced at the postconviction hearing did not support a finding of "governmental intimidation by a state actor" and so "Beecroft's attorneys were not required to take action." Finally, the postconviction court declined to address the significance of Backstrom's communications with Dr. Thomas and Dr. Roe.

Beecroft subsequently filed a notice of appeal from the postconviction court's order denying her request for a new trial and moved to reinstate her direct appeal. She then moved to consolidate the two appeals. We granted the motion.

In her combined appeal from her conviction and the postconviction order, Beecroft raises four claims. First, Beecroft asserts that her due process right to present a complete defense was violated because of the governmental interference with two expert witnesses—Drs. Roe and Ophoven.[7] Specifically, Beecroft argues that state actors interfered with her right to present expert witnesses in her own defense and her right to consult with expert witnesses. Second, Beecroft claims that she was denied effective assistance of trial counsel because her counsel failed to object to the alleged due process violations. Third, Beecroft asserts that the district court erred by failing to suppress her statement given during the hospital interview because the *Miranda* warning was insufficient and Beecroft's waiver of her *Miranda* rights was involuntary. Finally, Beecroft argues that we should exercise our supervisory power over the district courts and grant her a new trial in the interests of justice. In addition, amicus curiae Innocence Project of Minnesota requests that we "establish a workable, meaningful rule to guide the lower courts in prohibiting government officials (including law enforcement and prosecutors) from discouraging medical examiners from working for defendants or interfering in any way with such work, both inside and outside their appointed counties."

I.

Our analysis of Beecroft's claims on appeal must be considered in the context of the historic role of coroners and medical examiners and their important function and obligations in our modern criminal justice system. Any such analysis must take into account the independence, autonomy, and neutrality that we expect from medical examiners. This perspective takes on added importance given that the conduct of certain state actors in this case reflects what appears to be a growing point of view within Minnesota's law enforcement and prosecution communities that it is a "conflict of interest" for medical examiners to consult with or testify at the request of criminal defendants. It is not a conflict of interest for a medical examiner to consult with criminal defense attorneys or testify at a criminal defendant's request. Indeed, such activity is authorized and protected by law. *See* U.S. Const. amend. VI (protecting a criminal defendant's right to present witnesses in his defense); U.S. Const. amend. XIV, § 1 (protecting a per-

---

7. Beecroft does not claim that any governmental agent substantially interfered with Dr. Amatuzio.

son's right to due process); Minn. Const. art. I, § 6 (protecting a criminal defendant's right to present witnesses in his defense); Minn. Const. art. I, § 7 (protecting a criminal defendant's right to due process); Minn.Stat. § 390.251 (2010) (authorizing a medical examiner to perform physical examinations or tests incident to any matter of a criminal nature "when requested" by a publicly appointed criminal defense attorney).

## A. Historic Role of Coroners and Medical Examiners

While coroners and medical examiners have the same historical roots, their roles in the modern criminal justice system are distinguishable. The coroner system dates to at least 1194 A.D. in England, and coroners historically were "royal official[s] with countywide jurisdiction," *Black's Law Dictionary* 390 (9th ed.2009), who looked after the "administration of criminal justice and the revenue to the king resulting therefrom," 1 *Bouvier's Law Dictionary* 682 (8th ed.1914); *see also* Nat'l Research Council of the Nat'l Acads., *Strengthening Forensic Science in the United States: A Path Forward* 241 (National Academies Press 2009) [hereinafter *NRC Report*], *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf ("On behalf of the crown, the [coroner] was responsible for inquests to confirm the identity of the deceased, determine the cause and manner of death, confiscate property, collect death duties, and investigate treasure troves."). In later years, coroners were responsible for investigating deaths and occasionally assuming the duties of the county sheriff. *Black's, supra,* at 390. The traditional coroner system, however, established clear lines of separation between the coroner and sheriff; in particular, there were some duties such as " 'holding inquests upon dead bodies' " that belonged specifically to the coroner. *Id.* (quoting R.F. Hunnisett,

*The Medieval Coroner* 1 (1961)). Further, the coroner acted as a check on the sheriff's power because the coroner was responsible for "report[ing] criminal activity to the king's justices in eyre," and was subject to punishment if the justices learned of criminal activity in the county from another source. *Black's, supra,* at 390.

American colonists brought the British common-law coroner system with them to the New World. *See NRC Report, supra,* at 241. In the United States a coroner is an elected or appointed public official who is typically responsible for administering death investigations but may also perform other executive, judicial, or administrative functions. *Id.* at 247; *Black's, supra,* at 390 (defining the modern coroner as a "public official whose duty is to investigate the causes and circumstances of any death that occurs suddenly, suspiciously, or violently"). Although coroners in Minnesota are now required to be licensed physicians and obtain special "medicolegal" death investigation training, Minn.Stat. § 390.005, subd. 3(b) (2010), coroners traditionally had—and in some states still have—little or no medical training, *see NRC Report, supra,* at 241–42, 247–48.

Medical examiners, on the other hand, "are almost always physicians, are appointed, and are often pathologists or forensic pathologists." *Id.* at 248. Medical examiners "serve the criminal justice system as medical detectives by identifying and documenting pathologic findings in suspicious or violent deaths and testifying in courts as expert medical witnesses." *Id.* at 244. Specific tasks performed by medical examiners include "death scene investigations, medical investigations, reviews of medical records, medicolegal autopsies, determination of the cause and manner of death, and completion of the certificate of death." *Id.* at 243.

In 1971, Minnesota joined a growing number of states when it shifted responsibility for death investigations to medical examiners, except in those counties that elected to retain the coroner system.[8] Act of May 17, 1971, ch. 367, §§ 1–5, 1971 Minn. Laws 622, 622–26 (codified as amended at Minn.Stat. §§ 390.33, subd. 9, 390.34, and 390.35 (2010)). Medical examiners in Minnesota must be board-certified or board-certification-eligible forensic pathologists, Minn.Stat. § 390.005, subd. 3(a) (2010), and are responsible for investigating "[a]ll sudden or unexpected deaths and all deaths that may be due entirely or in part to any factor other than natural disease processes," Minn.Stat. § 390.11, subd. 1 (2010). Medical examiners also provide "professional assistance" to other government officials investigating sudden and unexplained deaths. Minn.Stat. § 390.31, subd. 1 (2010).

### B. Independence, Autonomy, and Neutrality of Medical Examiners

Medical examiners theoretically enjoy autonomy from those government officials directly responsible for investigating and prosecuting crimes. In 2006 the Minnesota Legislature expressed its commitment to medical-examiner independence by rewriting the law governing coroners and medical examiners.[9] Act of June 1, 2006, ch. 260, art. 8 §§ 1–21, 2006 Minn. Laws 816, 816–829 (codified as amended at Minn. Stat. ch. 390 (2010)). By statute, a medical examiner "is an *independent* official of the county, subject only to appointment, removal, and budgeting by the county board." Minn.Stat. § 390.011 (2010) (emphasis added). Thus, similar to a traditional coroner who occasionally worked alongside the county sheriff but also acted as a check on the sheriff's power, a medical examiner may from time to time assist law enforcement by conducting honest and objective death investigations, but must at all times remain a neutral participant in our criminal justice system.

An important justification for the independence of medical examiners is the public's interest in having accurate scientific findings available during an inquiry into a sudden, unexpected, or suspicious death. It should be undisputed that the quality of forensic investigation improves when medical examiners operate free from the influence of law enforcement and prosecutors. *Cf. NRC Report, supra,* at 23–24 (reporting that when forensic scientists are "driven in their work by a need to answer a particular question related to the issues of a particular [criminal] case, they [may] face pressure to sacrifice appropriate methodology for the sake of expediency"). In its standards for medicolegal death investigators, the National Association of Medical Examiners ("NAME")[10] proclaims that independence from law enforcement agencies and prosecutors "promotes neutral and objective medical assessment of the cause and manner of death." Garry F. Peterson & Steven C. Clark, Nat'l Assoc.

---

8. The trend of shifting from the coroner system to medical examiners began as long ago as 1877, when "[c]oroners were abolished in Massachusetts ... [in favor of] 'able and discreet men learned in the science of medicine.'" *In re Senior,* 221 N.Y. 414, 117 N.E. 618, 618 (1917) (quoting Revised Laws of Mass. c. 24).

9. The revisions were endorsed by the Minnesota Coroner's & Medical Examiners' Association, the Minnesota Medical Association, the Minnesota County Attorneys Association, and the Minnesota Funeral Directors Association. *See Coroners and Medical Examiners—Judiciary Issues: Hearing on S.F. No. 3250 Before the Senate Judiciary Comm.,* 84th Minn. Leg., Mar. 23, 2006 (audio tape).

10. NAME's motto is "Hic locus est ubi gaudet succurrere vitae"—"This is the place where death delights to help the living."

of Med. Standards, *Forensic Autopsy Performance Standards* 7 (2011).

Most medical examiners "view themselves first and foremost as scientists, beholden not to one side or the other, but only to the truth." Mark Hansen, *CSI Breakdown*, A.B.A. J., Nov. 2010, at 44, 46. In other words, a medical examiner's primary purpose is not to solve crimes but to serve the public by determining how people die. *See, e.g., United States v. Rosa,* 11 F.3d 315, 332 (2d Cir.1993). In *Rosa,* the Second Circuit said:

> [Al]though law enforcement activities are typically accusatory and adversarial in nature, a medical examiner's reported observations as to a body's condition are normally made as part of an *independent* effort to determine a cause of death. Indeed, a medical examiner, although often called a forensic expert, bears more similarity to a treating physician than he does to one who is merely rendering an opinion for use in the trial of a case.

*Id.* at 332 (emphasis added) (citations omitted) (internal quotations omitted); *see also People v. Washington,* 86 N.Y.2d 189, 193, 630 N.Y.S.2d 693, 654 N.E.2d 967 (1995) (explaining that a medical examiner's mandate "is clear, to provide an impartial determination of the cause of death"). Unfortunately, "[s]ome police and prosecutors tend to view government-employed forensic scientists, including medical examiners, not as independent experts, but as members of the prosecution's 'team'." Hansen, *supra,* at 46; *see NRC Report, supra,* at 187.

As previously noted, our Legislature has explicitly rejected the proposition that medical examiners serve only the police and prosecutors. Indeed, the Legislature has explicitly provided that a "medical examiner may, when requested, make physical examinations and tests incident to any matter of a criminal nature under consideration by the district court or county attorney, law enforcement agency, *or publicly appointed criminal defense counsel.*" Minn.Stat. § 390.251 (emphasis added). Section 390.251 recognizes that forensic science is not and should not become the sole province of the police and prosecutors. In the search for truth and justice, forensic science must be "equally available to law enforcement officers, prosecutors, *and* defendants." *NRC Report, supra,* at 17 (emphasis in original). Likewise, medical examiners, in their role as forensic scientists, must not be beholden to the police and prosecutors. Instead, as independent public officials, medical examiners must be available to advise and assist publicly appointed defense counsel and to testify on behalf of criminal defendants. *See* Minn. Stat. § 390.251; *see also* Minn.Stat. § 611.21 (2010) (requiring a district court to authorize expert witness fees for indigent defendant if the court finds that the expert services are necessary). Today, we reaffirm what the law already mandates—medical examiners are independent public officials, free to make examinations on behalf of, submit reports to, consult with, and testify at the request of criminal defendants. *See* Minn.Stat. §§ 390.011, 390.251; 611.21.

There are also practical considerations that underlie this mandate. As the *NRC Report* explains, there are fewer than 500 forensic pathologists practicing full time in the United States. *NRC Report, supra,* at 257. In Minnesota, there are only about 20 forensic pathologists, and nearly all of them work in some capacity with at least one county medical examiner's office. *See* Katie Humphrey, *What Is the Role of Pathologists in Law and Order?,* Star Tribune, Mar. 8, 2009, http://www.startribune.com/local/south/40929767.html?page=2&c=y. If every forensic pathologist associat-

ed with a medical examiner's office in one capacity or another were barred from assisting or testifying on behalf of criminal defendants, it would significantly restrict defense access to expert assistance. As Dr. Thomas explained in her first email to Dakota County Attorney James Backstrom:

If we [forensic pathologists] all refused to look at other people's cases, the excellent legal system we have in Minnesota would not function. Our system depends on both the prosecution and the defense having access to qualified experts, including forensic pathologists.

Thus, both our laws and practical considerations support the mandate that medical examiners must at all times remain independent, autonomous, and neutral participants in our criminal justice system.

## C. Fallible Forensic Evidence and Scientific Methods

At this point it is instructive to provide some examples of why we must ensure defense access to forensic experts, including forensic pathologists. Mistakes by forensic analysts do happen, and when they happen they can have dramatic consequences. According to Innocence Project, 289 persons have now been exonerated through postconviction DNA testing through the nationwide Innocence Network. *Facts on Post–Conviction DNA Exonerations*, Innocence Project, http://innocenceproject.org/Content/351.php (last visited May 15, 2012). In approximately half of these exonerations, the misapplication of forensic methodologies and/or procedures may have played a role in convicting the innocent person. *Id.; see also infra*, note 16. It is now beyond dispute that some evidence that had been presumed to be valid forensic science and had been admitted in criminal trials has subsequently been proven fallible. This shortcoming in our criminal justice system is a major reason why defendants must have access to their own forensic experts in order to challenge and test the validity of the government's forensic evidence.

An example of a discredited field of forensic science involves the analysis of lead in bullets. For over four decades, the FBI offered Composite Bullet–Lead Analysis ("CBLA") as a forensic service to connect suspects to crimes. *Gassler v. State*, 787 N.W.2d 575, 580 (Minn.2010). CBLA is based on the assumptions that each manufactured "batch" of bullets shares the same trace elements and chemical makeup and that no two batches are ever produced with the same chemical makeup. *See id.* As part of CBLA, FBI scientists used chemistry to match bullets to a manufacturing "batch"; that is, bullets recovered from a crime scene were linked to packages or boxes of bullets that were presumably manufactured in the same "batch." *See* John Solomon, *FBI's Forensic Test Full of Holes*, Wash. Post, Nov. 18, 2007, http://www.washingtonpost.com/wp-dyn/content/article/2007/11/17/AR2007111701681.html. In 2006 the Maryland Court of Appeals (that state's highest court) ordered a new trial for a defendant who had been convicted of murder based on CBLA. *Clemons v. State*, 392 Md. 339, 896 A.2d 1059 (2006). The Maryland court concluded that CBLA is "not generally accepted within the scientific community" and was thus no longer admissible in Maryland courts. *Id.* at 1070; *see also Gassler*, 787 N.W.2d at 580–81 (reporting that the FBI sent a letter to the Minnesota Attorney General's office stating that it would be inappropriate for an agent to state with scientific certainty, based on CBLA, that two bullets came from a particular box of ammunition or came from a particular source of lead).

Here, we must pause to emphasize that we do not conduct an examination of the

flaws in forensic science to diminish the extremely valuable work done by forensic experts who serve our criminal justice system. To the contrary, we recognize that these experts play an integral role in our criminal justice system. But we need these experts to always do their absolute best and at all times remain neutral, objective, and free from influence when they are generating reports; providing counsel to investigators, prosecutors, or criminal defendants; or testifying at trial. We must take all steps necessary to ensure that both the prosecution and the defense have equal access to these experts with the understanding that two forensic experts can analyze the same data and reach different conclusions. Further, we must put in place systems and procedures that will ensure that the work product and opinions of forensic experts will be properly scrutinized. An understanding that science can fail us only reinforces the belief that we must always hold forensic science experts to the highest standards to ensure that we do not repeat the mistakes of the past.[11]

## II.

▉ The next step in our analysis is to address the specific allegations of error that Beecroft raises in her appeal. We turn first to Beecroft's due process claims—that she was denied the right to present her own witnesses and the ability to consult with her own expert witnesses. When a defendant initially files a direct appeal and then moves for a stay to pursue postconviction relief, we review the post-conviction court's decisions using the same standard that we apply on direct appeal. *State v. Maurstad*, 733 N.W.2d 141, 146 (Minn.2007). Whether a due process violation has occurred presents a question of constitutional law, which we review de novo. *State v. Bobo*, 770 N.W.2d 129, 139 (Minn.2009). Because Beecroft did not specifically object on due process grounds at trial, we review her due process claims on appeal for plain error. *See* Minn. R.Crim. P. 31.02; *State v. Jenkins*, 782 N.W.2d 211, 229–30 (Minn.2010). Plain error exists when there is (1) error, (2) that is plain, and (3) affects the defendant's substantial rights. *See Jenkins*, 782 N.W.2d at 230. "An error is plain if it is clear or obvious." *State v. Jones*, 753 N.W.2d 677, 686 (Minn.2008). If these three requirements are satisfied, we then consider "whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings." *State v. Goelz*, 743 N.W.2d 249, 258 (Minn.2007) (citations omitted) (internal quotations omitted).

Both the United States Constitution and the Minnesota Constitution guarantee a criminal defendant the right to due process. *McCollum v. State*, 640 N.W.2d 610, 617–18 (Minn.2002) (citing U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 7). Beecroft asserts that the due process violation here is twofold: first, state actors interfered with her right to present witnesses in her defense; and second,

---

11. Our concern about the accuracy of testimony by medical examiners and the need to have that testimony properly tested in an adversarial environment is illustrated by some recent events in Minnesota. Last year, the Douglas County District Court granted a new trial to a man who was convicted of second-degree murder for the death of his infant daughter. *Hansen v. State*, No. 21–KX–04–1222 (Minn.Dist.Ct. July 13, 2011). The court concluded that the State's medical examiner gave "false or incorrect" testimony in the murder trial and that "[t]he jury might have reached a different conclusion in [the] case without this testimony." *Id.* Although the Douglas County court's decision is not before us here, the findings of the district court demonstrate why a given party may want to have someone with the qualifications of a medical examiner available to consult and testify.

state actors deprived her of her right to the assistance of expert consultants.

### A. State Action

 As part of our analysis, we must first determine whether the alleged due process violations asserted by Beecroft were caused by state action. This analysis must be conducted because the conduct of private parties generally lies beyond the scope of the United States Constitution. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 721–22, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Likewise, "[t]he Minnesota Constitution does not accord affirmative rights to citizens against each other; its provisions are triggered only by state action." *State v. Wicklund*, 589 N.W.2d 793, 801 (Minn.1999).

 The State concedes that Dakota County Attorney James Backstrom is a state actor. The State asserts, however, that Dr. Uncini's conduct is not subject to constitutional review. The State argues that Dr. Uncini was acting in a private capacity when he restricted Dr. Ophoven, his subcontractor, from testifying at the request of criminal defendants in Minnesota.[12]

 We have held that constitutional restrictions on conduct may be applied against private conduct if the conduct is sufficiently " 'entwined with governmental character.' " *Id.* (quoting *Brennan v. Minneapolis Soc. for the Blind, Inc.*, 282 N.W.2d 515, 524 (Minn.1979)); *see also Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (holding that private conduct becomes state action when a "sufficiently close nexus" exists between the state and the challenged conduct). Thus, a private individual who is a government contractor may qualify as a state actor "while acting in [an] official capacity or while exercising . . . responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). In *West*, the United States Supreme Court held that when a state completely delegates its duty to a private entity, the entity functions as a state actor because its conduct is fairly attributable to the state. *Id.* at 54, 108 S.Ct. 2250. According to the Court, it is immaterial whether the private entity provided services to the state pursuant to a contractual agreement. *Id.* at 55–56, 108 S.Ct. 2250.

Minnesota Statutes chapter 390 requires each county to appoint a coroner or medical examiner to perform death investigations. Minn.Stat. § 390.005, subd. 1 (2010). Like many Minnesota counties, Saint Louis County has delegated its duty to perform death investigations to a private forensic pathologist. At all times relevant to this case, Dr. Uncini served as the Chief Medical Examiner for Saint Louis

---

12. As we begin our analysis of Beecroft's due process claims, it is important to note that it would be a mistake to make the actions of Dakota County Attorney James Backstrom the sole or even the primary focus of the state action that Beecroft challenges on appeal. Unquestionably, Backstrom sent "threatening" emails to Dr. Thomas, and he has been held accountable for that act. *In re Backstrom*, 767 N.W.2d 453, 453 (Minn.2009). But it is important to remember that Backstrom is an experienced, well-respected prosecutor who has been recognized statewide and nationally for his work. He has often as-

sumed a leadership role within Minnesota's law enforcement community, and the record does not indicate that he acted with any malefic intent when he sent the emails. Rather, the emails indicate that Backstrom thought he was performing his job as a county attorney and was acting as a senior, experienced spokesperson for his fellow county attorneys and the law enforcement community. Backstrom appears to have been advocating a point of view that has certainly gained a foothold in Minnesota—that medical examiners who testify on behalf of criminal defendants create a "conflict of interest."

County. Although Dr. Uncini did not serve full time as a government official, he was a county official while acting as the county's Chief Medical Examiner. *See West*, 487 U.S. at 50, 108 S.Ct. 2250; *see also* Minn.Stat. § 390.011 (describing the medical examiner as an "independent official of the county"). Minnesota law authorized Dr. Uncini to appoint assistant medical examiners. Minn.Stat. § 390.05 (2010). Dr. Uncini's contract with the county empowered him to "obtain the assistance of other physicians in performing the professional work of the Medical Examiner's Office." It was in Dr. Uncini's official capacity as Chief Medical Examiner that he contracted with Dr. Ophoven to be an Assistant Saint Louis County Medical Examiner. Thus, in his dealings with Dr. Ophoven, Dr. Uncini was " 'clothed with the authority of state law.' " *West*, 487 U.S. at 49, 55, 108 S.Ct. 2250 (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)).

■ Nevertheless, the State disputes that Dr. Uncini was a state actor. The State points out that Dr. Uncini testified at Beecroft's postconviction hearing that it was his personal decision to restrict Dr. Ophoven from testifying as an expert for criminal defendants in the state. But regardless of who made the decision to impose the restriction, Dr. Uncini's conduct constitutes state action if he imposed the restriction while he was acting in his official capacity. As the Supreme Court explained in *West*, " 'If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity.' " 487 U.S. at 56 n. 15, 108 S.Ct. 2250 (quoting *Griffin v. Ma-*

*ryland*, 378 U.S. 130, 135, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964)). Here, Dr. Uncini sent a formal letter to Dr. Ophoven on Saint Louis County letterhead restricting her from performing "criminal defense work in the State of Minnesota while employed as an Assistant Saint Louis County Medical Examiner." Dr. Uncini signed the document as "Chief Medical Examiner." Further, Dr. Uncini imposed the restriction on Dr. Ophoven only after he attended a series of meetings with the Saint Louis County Attorney, the Saint Louis County Sheriff, and two assistant county attorneys to discuss concerns about Dr. Ophoven's work with criminal defendants. In fact, Dr. Uncini's letter to Dr. Ophoven stated that the decision to impose the restriction was "a result of [the] meetings" he had with Saint Louis County officials.

■ For all the foregoing reasons, we conclude that Dakota County Attorney James Backstrom was a state actor when he sent the emails to Dr. Thomas. We also conclude that Saint Louis County Chief Medical Examiner Dr. Thomas Uncini was a state actor when he restricted Dr. Ophoven from testifying on behalf of criminal defendants in Minnesota.[13] *See Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).

### B. Right to Present Witnesses

■ We turn next to the merits of Beecroft's due process claims. Beecroft first claims that state actors violated her right to present her version of the facts through the testimony of certain expert witnesses. The right of a defendant to present a complete defense is an essential principle of our criminal justice system

---

**13.** When Dr. Uncini learned that Backstrom was disciplined by our court in June 2009 for Backstrom's actions related to this matter, Dr. Uncini withdrew the restrictions and notified the Saint Louis County Attorney's Office of the change in policy.

and is guaranteed by the Due Process Clause of both the United States Constitution and the Minnesota Constitution. *See California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *State v. Richards,* 495 N.W.2d 187, 191 (Minn.1992) (citing U.S. Const. amend. XIV; Minn. Const. art. 1, § VII). In *Washington v. Texas,* the Supreme Court explained this fundamental right:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts ... to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.

388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Not only does a defendant have a right to present a complete defense, a defendant has a right—at least in theory—to meet the State as an equal in our adversarial system of justice: "strength against strength, resource against resource, argument against argument." *United States v. Bagley,* 473 U.S. 667, 694 n. 2, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (Marshall, J., dissenting) (citation omitted) (internal quotations omitted). Therefore, if factfinders are exposed to the opinions of the government's expert witnesses, a defendant must have an equal opportunity to present to the factfinders the opposing views of the defendant's experts.[14] *See Barefoot v. Estelle,* 463 U.S. 880, 898–99, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), *superseded on other grounds by* 28 U.S.C. § 2253(c)(2).

■ We have said that "[i]n determining whether the State has infringed on a defendant's constitutional right to present a defense by [interfering with defense witnesses] ..., the dispositive question ... is whether the government actor's interference with a witness's decision to testify was substantial." *State v. Graham,* 764 N.W.2d 340, 349 (Minn.2009) (citations omitted) (internal quotations omitted). "Substantial" interference occurs when a "government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." *United States v. Serrano,* 406 F.3d 1208, 1216 (10th Cir.2005); *see also United States v. Goodwin,* 625 F.2d 693, 703 (5th Cir.1980) ("Threats against witnesses are intolerable.").

■ Here, Backstrom sent several emails to Dr. Roe's supervisor, Dr. Thomas, stating that Backstrom was "disturbed" that Dr. Roe was willing to testify as a defense expert and that such conduct was a "conflict of interest." Further, Dr. Roe was listed as one of Beecroft's potential witnesses until Backstrom sent an email to Dr. Thomas, "threatening to withdraw

---

14. When the government has presented expert testimony, a defendant who is unable to present the testimony of his own well-informed experts loses a critical opportunity to cast doubt on the government's evidence. *See Ake v. Oklahoma,* 470 U.S. 68, 84, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Moreover, in the context of expert forensic testimony, the right to counter the government's expert testimony takes on additional significance. Justice Harry Blackmun recognized that jurors "tend to assume [scientific evidence] is more accurate and objective than lay testimony." *Barefoot,* 463 U.S. at 926 n. 8, 103 S.Ct. 3383 (Blackmun, J., dissenting) (internal quotations omitted) (citation omitted). Consequently, "[t]he major danger of scientific evidence is its potential to mislead the jury" because "an aura of scientific infallibility may shroud the evidence and thus lead the jury to accept it without critical scrutiny." Paul C. Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half–Century Later,* 80 Colum. L.Rev. 1197, 1237 (1980).

support" from Dr. Thomas as the Chief Dakota County Medical Examiner "unless [Dr. Thomas] barred her subordinates [(including Dr. Roe)] from testifying as defense experts in criminal cases." *In re Backstrom*, 767 N.W.2d 453, 453 (Minn. 2009). The record indicates that Dr. Roe reviewed these emails, feared for her own professional and financial well-being as a result, and subsequently severed all ties with Beecroft's defense. Thus, we conclude that Backstrom's conduct constitutes substantial interference.

■ Further, it is undisputed that Dr. Ophoven's alleged unavailability as a witness for the defense was caused solely by Dr. Uncini's specific restrictions. These restrictions, which were in place well before Beecroft's trial, prevented Dr. Ophoven from testifying at the request of criminal defendants in Minnesota if she wanted to continue her role as an Assistant Saint Louis County Medical Examiner. In essence, Dr. Uncini told Dr. Ophoven that Dr. Ophoven could not do what the law says she may do. *See* U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; Minn. Stat. §§ 390.251; 611.21. Although Dr. Ophoven admitted that she never asked Dr. Uncini about the possibility of testifying at Beecroft's trial, Dr. Ophoven had no reason to make such a request because it was Dr. Ophoven's understanding that the restrictions placed on her by Dr. Uncini were an absolute condition of her employment. This point was made abundantly clear when Dr. Ophoven testified at Beecroft's postconviction hearing that if Beecroft's counsel had subpoenaed her to testify as a defense expert, she would have been uncooperative and would have stated that she was testifying against her wishes. Thus, we conclude that Dr. Uncini's actions also fit within the definition of substantial interference.

The State argues that it was not substantial interference by state actors that created the unavailability of Dr. Roe and Dr. Ophoven; rather, the State contends that it was defense counsel's strategic decision not to call either doctor that created the doctors' unavailability. Yet, even if defense counsel's decision was "strategic," that decision may well have been influenced by the conduct of state actors. Indeed, Backstrom's emails to Dr. Thomas clearly played a role in defense counsel's decision not to place Dr. Roe in an "untenable position" by calling her to testify. Defense counsel explained,

> [We] would not in any way suggest that the only reason that Dr. Roe is not being called is because of the communication in those emails. But it is certainly a factor that we considered and specifically, a factor that our potential witness, Dr. Roe, *asked us in no uncertain terms to consider.*

(Emphasis added). Further, counsel testified at Beecroft's postconviction hearing that they *would have* called Dr. Ophoven to testify if she had been available. But counsel also testified that they did not subpoena Dr. Ophoven because it was their understanding that "both at the time [the defense] hired [Dr. Ophoven] and at the time of trial, [Dr. Ophoven] would not be allowed to testify for the defense."

Beecroft had the right to present *her* version of the case to the trier of fact and to "present [*her*] *own witnesses* to establish a defense." *See Washington*, 388 U.S. at 19, 87 S.Ct. 1920 (emphasis added). Regardless of whether Beecroft would have ultimately called Dr. Roe and/or Dr. Ophoven as witnesses, the choice was Beecroft's to make—not the State's. Based on this sequence of events, we conclude that Backstrom's emails and Dr. Uncini's restrictions created a situation in which it would be too risky to Dr. Roe's

and Dr. Ophoven's professional careers for them to testify. These events also limited defense counsel's willingness to compel these now-reluctant witnesses to testify. Therefore, we conclude that state actors' substantial interference with Beecroft's right to present witnesses constitutes error.

■ The next step in our plain error analysis is to determine if the error was plain. But, even when plain error is present, our court will not reverse the district court unless that error affects substantial rights. *Jones,* 753 N.W.2d at 686 (citing *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998)). Here, there is no need to address the question whether the error was plain, because even assuming that the error was plain, Beecroft does not prevail on the third prong of the plain-error analysis: the state actors' interference did not affect Beecroft's substantial rights.

■ An error affects a defendant's substantial rights if there is a reasonable likelihood that the error had a "significant effect" on the verdict. *State v. Sontoya,* 788 N.W.2d 868, 873 (Minn.2010) (citing *Griller,* 583 N.W.2d at 741). In making the substantial rights determination, we consider the strength of the State's case, the level of harm caused by the error, and whether the defendant had an opportunity to respond. *See id.*

The potential for harm from the error committed here was great. This case was tried before a district court judge, not a jury, and the court's verdict relied heavily on the forensic pathologists who testified. Indeed, the defense's theory of the case—that Beecroft's baby was already dead when Beecroft stabbed her—depended almost entirely upon expert forensic testimony. But Beecroft's expert testimony was compromised by the conduct of state actors.

First, Dr. Amatuzio testified only in her capacity as a private physician and not as the forensic pathologist serving as the medical examiner for nine Minnesota counties. Second, neither Dr. Amatuzio nor Dr. Wetli is an expert in pediatric or perinatal pathology. At trial the State attacked Dr. Wetli's lack of expertise and specialized experience in pediatric pathology during its cross-examination of Dr. Wetli and during its closing argument. Dr. Ophoven, on the other hand, is a trained specialist in pediatrics who has more than 30 years of experience in pediatric and perinatal pathology. Third, Dr. Roe's and Dr. Ophoven's testimony would not have been, as the State argues, either cumulative or unhelpful. Concededly, Dr. Ophoven would have testified to the same ultimate conclusion as Dr. Amatuzio and Dr. Wetli. But Dr. Ophoven's testimony would have been helpful to Beecroft's defense because Dr. Ophoven not only serves as a medical examiner, but also is a trained expert in pediatric and perinatal pathology. Additionally, although Dr. Roe was not certain whether the baby was born alive or stillborn, Dr. Roe—who is an assistant medical examiner in eight Minnesota counties—disagreed with a number of findings testified to by the State's forensic experts. Thus, Dr. Roe's testimony may have undermined the credibility of the State's expert witnesses. Moreover, Dr. Roe's uncertainty over whether the baby was born alive or stillborn could well have had a critical impact in a case where the State's burden is to prove guilt beyond a reasonable doubt. *See State v. Ewing,* 250 Minn. 436, 442, 84 N.W.2d 904, 909–10 (1957).

Nevertheless, the State had a strong case against Beecroft even if certain state actors had not interfered with her ability to present testimony by Dr. Roe and Dr. Ophoven. The district court stated in its verdict that "there would be no reason to stab a child that was not born alive." While this statement may be debatable, there was evidence that Beecroft admitted

to the police and her mother that she saw the baby's finger move and admitted to a friend that the baby's eyes were "half open." Moreover, Beecroft had an opportunity to seek further relief from the harm caused by Backstrom's interference with Dr. Roe but affirmatively rejected the opportunity to do so. Similarly, Beecroft did not challenge Dr. Ophoven's unavailability because of Dr. Uncini's restrictions. Beecroft's actions at trial collectively weigh against a determination that she was unfairly prejudiced.

Finally, the postconviction court, which was also the factfinder at trial, found that Dr. Ophoven lacked credibility and would have had limited usefulness as a witness. Thus, we conclude that there is not a reasonable likelihood that the harm caused by the error in this case had a "significant effect" on the district court's verdict. *See Sontoya,* 788 N.W.2d at 873. This is especially so when the district court's verdict, unlike the general verdict of a jury, is supported by specific findings of fault. The record before us and our standard of review, which mandates a plain-error analysis, lead us to conclude that Beecroft's claim that the State violated her right to present witnesses does not, by itself, warrant reversal and a new trial.

### C. Beyond the Right to Cross–Examination—Right to Consult with Forensic Experts

■ Beecroft also claims that because Dr. Roe stepped down as a consulting expert in the middle of the trial, Beecroft was deprived of her due process right to present a complete defense. In *Ake v. Oklahoma,* the Supreme Court held that the government was required to provide an indigent defendant with access to a psychiatrist to assist in his defense when the defendant's sanity was a "significant factor" at trial. 470 U.S. 68, 74, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). More specifically, the Court held that "[m]eaningful access to justice" and the due process right to present a complete defense encompass a right to the "'basic tools of an adequate defense.'" *Id.* at 77, 105 S.Ct. 1087 (quoting *Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971)). Thus, the Court concluded that when scientific evidence is a "significant factor" at trial, one "basic tool" that must be available to indigent defendants is access to the assistance of an expert for conducting professional examinations, consulting on possible affirmative defenses or trial strategies, and preparing to cross-examine the government's expert witnesses. *See id.* at 82–83, 105 S.Ct. 1087. The Court reached this conclusion because defense counsel must be able to recognize any faulty methods, inconsistent statements, or inaccurate conclusions reached by the government's experts. *See id.* at 82, 105 S.Ct. 1087.[15]

■ The United States Constitution and our adversarial process protect the

15. A recent case from Texas illustrates how a prosecutor's inaccurate conclusions based on a medical examiner's testimony can lead to a gross miscarriage of justice. In 1987 Michael Morton was convicted on circumstantial evidence of first-degree murder for the death of his wife. He was sentenced to life in prison. *See In re Morton (Morton II),* 326 S.W.3d 634 (Tex.App.2010); *Morton v. State (Morton I),* 761 S.W.2d 876, 879–80 (Tex.App.1988). In the case, the prosecutor made unchallenged and unsubstantiated statements in his closing argument regarding the testimony of the State's medical examiner. Specifically, the prosecutor mischaracterized the medical examiner's testimony that scientific evidence "proved" that Morton had killed his wife when, in fact, the medical examiner had stopped short of that conclusion. After Morton had already served nearly 25 years in prison, his defense counsel convinced the Texas Court of Appeals to allow the examination

right of an accused to challenge evidence presented by the government. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). In particular, the Sixth Amendment right of an accused to confront the government's witnesses is a fundamental right, and this right includes the right to cross-examine witnesses. *Id.* When properly employed, cross-examination can "weed out" the fraudulent or false testimony of the government's witnesses. *See Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 2537, 174 L.Ed.2d 314 (2009). But, most criminal defense lawyers "have insufficient training and background in scientific methodology, and they often fail to fully comprehend the approaches employed by different forensic science disciplines and the reliability of forensic science evidence that is offered in trial." *NRC Report, supra,* at 27; *see also* John M. West, Note, *Expert Services and the Indigent Criminal Defendant: The Constitutional Mandate of* Ake v. Oklahoma, 84 Mich. L.Rev. 1326, 1340 (1986)

("When counsel is shown a pathology report, a post-mortem photograph and drawer full of autopsy specimens and slides ..., he will be unlikely to spot possible errors of interpretation or description, the omission of relevant data or procedures, or indeed, the very significance ... of what he is shown." (citation omitted)). Therefore, *Ake* recognizes that a defendant's right to confrontation in the context of expert forensic testimony is severely diminished and may well be meaningless without access to her own consulting experts.[16]

There can be no doubt that the question of whether Beecroft's baby was alive or dead when Beecroft stabbed her was a "significant factor" at Beecroft's trial. *Ake,* 470 U.S. at 74, 105 S.Ct. 1087. Another "significant factor" was whether defense counsel effective cross-examination of the State's expert witnesses required the advice of a defense expert. As defense counsel testified at Beecroft's postconvic-

of certain material evidence, which evidence, after DNA analysis, showed that another man was likely responsible for the brutal killing of Morton's wife. *Morton II,* 326 S.W.3d at 638–45. A Texas trial court subsequently entered an order exonerating the now–57–year–old Morton because no rational jury would have convicted him. *See Ex Parte Morton,* No. AP–76663, 2011 WL 4827841, at *1 (Tex. Crim.App. Oct. 12, 2011).

16. A recent study of the trials of 137 innocent persons, "all convicted of serious crimes, who were later exonerated by post-conviction DNA testing," confirms the importance of expert consultation to effective cross-examination. Brandon L. Garrett & Peter J. Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions,* 95 Va. L.Rev. 1, 1 (2009) (emphasis omitted). The authors of the study conducted a thorough review of transcripts from all 137 trials and "found that in the bulk of these trials of innocent defendants—82 cases or 60%—forensic analysts called by the prosecution provided invalid testimony." *Id.* at 2. According to the authors, failure of de-

fense counsel to fully and effectively cross-examine the government's expert witnesses contributed to many of the convictions. *See id.* at 89. This failure to properly cross-examine expert witnesses, in turn, appeared to be caused by the defendants' lack of access to their own defense experts: "[D]efense attorneys cannot be expected to understand scientific evidence and effectively cross-examine [government] experts, much less test the accuracy of the underlying data, without access to defense experts." *Id.* To put it differently:

[I]f the opinion of the [government's] expert, a person who scrutinizes scientific evidence on a day-to-day basis, is suspect, how can one expect the average, reasonably competent defense attorney to have such a sophisticated understanding of the expert's subject matter that he will be capable of shedding proper light on the weaknesses of the government expert's opinion for the benefit of the jury?

John F. Decker, *Expert Services in the Defense of Criminal Cases: The Constitutional and Statutory Rights of Indigents,* 51 U. Cin. L.Rev. 574, 579 (1982).

tion hearing, "I do not have a medical degree.... I consult with medical experts ... to determine whether or not the information that was provided to me by the State is accurate." Moreover, there is no dispute that Beecroft planned to utilize Dr. Roe's expert consulting services throughout the trial.

In her dissent, the Chief Justice dismisses Beecroft's expert assistance claim by distinguishing the facts of this case from *Ake,* reasoning that "unlike Ake, Beecroft *was* provided expert consulting services throughout trial."[17] This distinction has some merit, but is inapplicable here because *Ake* does not answer the question raised by Beecroft under these facts. Specifically, Beecroft argues that she was entitled to have *the same* expert consultant throughout the trial. Put differently, Beecroft claims that having Dr. Roe as a consultant for the duration of the trial constituted a "basic tool" of an adequate defense and that Backstrom's conduct, which at least in part caused Dr. Roe to completely sever her ties and communication with defense counsel midtrial, constituted an infringement of Beecroft's right to present her defense.[18] Thus, the question in this case, while similar to the question answered in *Ake,* is more nuanced. But, we do not need to explicitly answer that question.

Here, we do not know with any certainty whether Beecroft would have benefited from having Dr. Roe serve as her consultant throughout the entire trial. For example, the record does not reveal whether defense counsel would have been better able to identify inconsistent testimony by the State's expert witnesses had counsel been assisted by Dr. Roe. But this likelihood exists and raises concern about whether Dr. Ophoven, who joined the defense team as a consultant partway through trial, was sufficiently apprised of all the issues that had already been addressed by the State's expert witnesses. Thus, our analysis leads us to the conclusion that whether Beecroft's right to expert assistance was violated is a much closer question than the Chief Justice finds it to be. Nevertheless, a thorough review of the record and the arguments made by Beecroft does not reveal that Dr. Roe's withdrawal during the trial caused any specific prejudice that warrants reversal. Given our standard of review, we conclude that Dr. Roe's decision to step down as a consulting expert did not deprive Beecroft of her right to present a complete defense.

### III.

 We turn next to Beecroft's claim that she was denied effective assistance of counsel. The Sixth Amendment of the United States Constitution guaran-

---

17. Beecroft had expert consulting services for almost the entire trial, because after Dr. Roe stepped down as an expert consultant, Dr. Ophoven stepped in to consult with the defense. The only period when Beecroft was without a consulting expert was during the testimony of one of the State's expert witnesses during the State's rebuttal, but the district court provided Dr. Ophoven with a transcript of the testimony in an effort to mitigate that lapse in expert assistance.

18. Beecroft's counsel told the district court during trial that within a week after Backstrom sent Dr. Thomas the email stating that

he was prepared to withdraw his support for her as Dakota County Medical Examiner, Dr. Roe "elected to, for all intensive [sic] purposes, completely sever her ties and communication with [defense counsel] regarding continued consultation" on the case. The record does not reveal Dr. Roe's actual motivation to withdraw from the case, but Beecroft's counsel asserted at trial that Backstrom's emails caused Dr. Roe to have a "good faith concern" about her continued employment as an assistant Dakota County medical examiner.

tees a criminal defendant reasonably effective assistance of counsel. *State v. Rhodes,* 657 N.W.2d 823, 842 (Minn.2003). In Minnesota, "[w]e apply the two-part ineffective assistance of counsel test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 [ (1984) ]." *State v. Miller,* 754 N.W.2d 686, 708 (Minn.2008) (citation omitted). Under the first part of the *Strickland* test, we review whether " 'counsel's representation fell below an objective standard of reasonableness.' " *Id.* at 708–09 (quoting *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052). There is a strong presumption that counsel's representation was reasonable. *See id.* at 709; *State v. Jones,* 392 N.W.2d 224, 236 (Minn.1986). Moreover, we will not typically disturb the strategic or tactical decisions of trial counsel. *See Leake v. State,* 737 N.W.2d 531, 542 (Minn.2007); *State v. Mems,* 708 N.W.2d 526, 534 (Minn. 2006). Under the second part of the *Strickland* test, we determine whether " 'a reasonable probability' " exists that the outcome of the trial would have been different but for counsel's errors. *Rhodes,* 657 N.W.2d at 842 (quoting *State v. Lahue,* 585 N.W.2d 785, 789 (Minn.1998)).

In this case, Beecroft's defense counsel took some steps to specifically raise the issue of the email communications to the district court. While counsel primarily focused on the ex parte nature of Backstrom's email to the court, counsel alluded to the "coercive statements" in Backstrom's emails to Dr. Thomas and argued that Dr. Roe's withdrawal from the case as a consultant for the defense may have been precipitated by the emails. In response to these arguments, the court agreed to make the emails part of the trial record. Further, as correctly noted by the Chief Justice's dissent, there is some evidence—including counsel's own admissions—that counsel made a tactical decision not to call Dr. Roe or Dr. Ophoven.

But there is also evidence that defense counsel failed to act vigorously to defend Beecroft. Counsel did not subpoena either Dr. Roe or Dr. Ophoven to testify and did not object on due process grounds to the doctors' unavailability as witnesses or consultants. With respect to Dr. Roe, counsel conceded that they intentionally made the wording of their motion to the district court regarding the email communications "somewhat vague because [they were not] sure what, if any, kind of relief [they] were seeking from [the] Court." Even after the district court expressed concerns that the emails might have deprived Beecroft "of the opportunity of having the same expert be [her] consulting expert throughout this case," counsel did not request a mistrial or any other specific relief. With respect to Dr. Ophoven, counsel admitted that it "didn't occur to [them]" to make a due process objection on the basis of Dr. Ophoven's unavailability, even after counsel learned that Dr. Ophoven's report was favorable to the defense's theory of the case.

It is understandable that defense counsel may have feared that they would place Dr. Roe or Dr. Ophoven in a difficult position if they compelled either to testify. Nevertheless, counsel's priority should have been to provide the best available defense to Beecroft. If Dr. Roe and Dr. Ophoven were the best witnesses and they were available, counsel should have compelled their testimony unless there was a strategic reason not to do so. Counsel should have provided the district court with the opportunity to remedy any problems resulting from the wrongful barrier erected by state actors to Dr. Roe's and Dr. Ophoven's availability. In other words, counsel should not have allowed their desire to avoid controversy or their concern for the doctors' plight to temper their duty to zealously represent Beecroft. If counsel had properly pursued this issue,

either the court could have remedied the problems or we would have had a better record upon which to review the claimed errors.

We conclude that the nature of the legal representation that Beecroft received at trial raises serious concerns about the quality of her defense. Accordingly, we are to some extent sympathetic to the analysis of our colleague, Justice G. Barry Anderson, and the conclusion in his concurrence that Beecroft was denied effective assistance of counsel. But given our standard of review, the state of the record, and the unique nature of the case before us, we conclude that we do not need to, nor should we reach the question of whether defense counsel's performance failed the *Strickland* test. Rather, we conclude that under the egregious facts of this case, the better route to take is to conclude that Beecroft is entitled to a new trial in the interests of justice.

### IV.

In addition to the specific allegations of error discussed above, Beecroft argues that we should reverse her conviction in the interests of justice. We typically will not award a criminal appellant a new trial in the absence of prejudicial error. *State v. Kaiser*, 486 N.W.2d 384, 387 (Minn.1992). But we have on occasion awarded a new trial in the interests of justice even when there is no showing of actual prejudice. *Id.* When doing so, we have relied on our "supervisory power to insure the fair administration of justice." *See State v. Scales*, 518 N.W.2d 587, 592 (Minn.1994). Put differently, our power to reverse "prophylactically or in the interests of justice comes from our power to supervise the trial courts." *State v. Salitros*, 499 N.W.2d 815, 820 (Minn.1993).

On several occasions, we have reversed convictions in the interests of justice based on prosecutorial misconduct. *See State v. Cabrera*, 700 N.W.2d 469, 475 (Minn.2005); *Salitros*, 499 N.W.2d at 820; *Kaiser*, 486 N.W.2d at 387. We have also previously cautioned the State that an "allegation of State intimidation of defense witnesses is not to be taken lightly." *Graham*, 764 N.W.2d at 349. We have taken this position because " '[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense.' " *State v. Blom*, 682 N.W.2d 578, 621 (Minn.2004) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)).

We recognize that a reversal by our court in the interests of justice is limited to "exceptional" circumstances, *see Gassler*, 787 N.W.2d at 586; but we conclude that exceptional circumstances are present here and preventative action by us is necessary. As previously noted, medical examiners are intended to be skilled, unbiased, and independent public officials who perform an essential fact-finding role in our criminal justice system. More specifically, an independent, autonomous, and neutral community of medical examiners is essential to the "fair administration of justice" in our state, and here, that independence, autonomy, and neutrality have been placed in doubt by the conduct of state actors.

In cases in which forensic testimony related to a death investigation is a significant factor in determining guilt or innocence, the assistance of a medical examiner—independent from the influence of law enforcement and prosecuting authorities—"may well be crucial to the defendant's ability to marshal his defense." *Ake*, 470 U.S. at 80, 105 S.Ct. 1087. Hence, equal access to these forensic experts is essential to a criminal defendant's ability to mount a meaningful defense in such a case. And without the assistance of expert forensic pathologists,

defendants will be placed at an "'unfair disadvantage.'" *Id.* at 82 n. 8, 105 S.Ct. 1087 (quoting *Reilly v. Berry*, 250 N.Y. 456, 166 N.E. 165, 167 (1929) (Cardozo, C.J.)). Imposition of such an unfair disadvantage is all the more troublesome when one considers the penalty that typically accompanies a first-degree murder conviction in Minnesota—life in prison without the possibility of release.

■ Beecroft's right to present a complete defense was limited by the conduct of several state actors. The record before us demonstrates that this conduct was not isolated. It appears instead that there is a widespread point of view among law enforcement officials, prosecutors, and perhaps other state actors that it is a "conflict of interest" for medical examiners to work with criminal defendants. Here, the conduct of state actors interfered with Beecroft's ability to consult with and call expert witnesses. These mistaken efforts by state actors unquestionably interfered with the independence of medical examiners, contravened clear legislative intent, and risked undermining Beecroft's constitutional rights; therefore, we conclude that we must exercise our supervisory powers and reverse Beecroft's conviction in the interests of justice.

■ "Justice is a process, not simply a result." *State v. Lefthand*, 488 N.W.2d 799, 802 (Minn.1992). This process requires the entire "criminal justice system, including judges, prosecutors, and defense lawyers" to be "responsible for the fair administration of justice." *State v. Windish*, 590 N.W.2d 311, 319 (Minn.1999). The prosecutor's obligation as "'a minister of justice ... is to guard the rights of the accused as well as to enforce the rights of the public.'" *State v. Ramey*, 721 N.W.2d 294, 300 (Minn.2006) (quoting *State v. Penkaty*, 708 N.W.2d 185, 196 (Minn.2006)). As the Supreme Court has explained, a

government lawyer "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, *but that justice shall be done.*" *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (emphasis added). In other words, "[t]he duty of the prosecutor is to seek justice, not merely to convict." *Ramey*, 721 N.W.2d at 300 (quoting *ABA Standards for Criminal Justice: Prosecution Function & Defense Function*, Standard 3–1.2(c) (3d ed.1993)).

The record in the case before us reveals that the conduct of several prosecutors and certain law enforcement officials appears to have fallen short of what we expect it to be. The Dakota County Attorney's office, Nicollet County Attorney's office, Saint Louis County Attorney's office, and Washington County Attorney's office (as counsel for the Minnesota Sheriffs' Association, not as a prosecuting attorney) all engaged in conduct that either explicitly or implicitly undermined Beecroft's access to the assistance of certain medical examiners. The belief that the testimony of these medical examiners would in some way impact the work of county attorneys in the future— presumably making their effort to overcome the presumption of innocence more difficult—appears to have partially motivated the conduct of these prosecutors.

Further, the belief among prosecutors that medical experts testifying at the request of criminal defendants creates a "conflict of interest" is not isolated to this case. For example, the Saint Louis County Attorney testified at Beecroft's postconviction hearing that prosecutors in her office were receiving calls from prosecutors *around the country* indicating their displeasure with the fact that Dr. Ophoven

was testifying on behalf of defendants. In addition, a number of recent news stories have included reports of significant interference by prosecutors in Minnesota and other states seeking to prevent medical examiners from working with criminal defendants. *See e.g.*, Hansen, *supra*, at 46 (reporting incidents in Georgia, Minnesota, Mississippi, and Wisconsin that demonstrate a "philosophical rift between some prosecutors and law enforcement officials, on the one side, and much of the forensic scientific community on the other").[19]

The response of the medical examiners involved in this case is enlightening. At Beecroft's trial, Dr. Amatuzio testified, "as a medical examiner, my job is to speak for the person who's died and render a medical opinion. I do not see that as a conflict of interest." The comments of Dr. Thomas in her email to Backstrom dated September 16, 2008, are even more direct and poignant:

[B]oth [Dr. Roe] and I ... consult with defense attorneys. We believe that consulting with defense attorneys actually makes us MORE credible as prosecution witnesses since we clearly testify as to what we believe to be true, not simply what "our side" wants us to.... Most forensic pathologists are comfortable having another forensic pathologist review their work—I am always interested in knowing what another pathologist thinks, and I believe it makes my work better, knowing that it will be reviewed....

I believe that you and all County Attorneys want *Truth and Justice* and would NOT want to convict someone who had not done what they were ac-

cused of doing. If a medical examiner is mistaken in their interpretation of the scene, investigation, or autopsy, wouldn't you want to have that corrected?

(Emphasis added.)

It is not disloyal for a medical examiner, who may testify as a State expert in the future, to consult with defense counsel or testify as a defense witness. Good medical examiners do not choose sides. Instead, a medical examiner must testify fairly and objectively regardless of which party calls the examiner to testify. Dr. Thomas explained it this way: "What [Dr. Roe] or I say in one county and in one case, we will say in another county and in another case. We don't change our testimony to please the requesting attorney."

It should be a matter of considerable concern to all persons who value "Truth and Justice"[20] and the integrity of the judicial process, that certain medical examiners in Minnesota appear to evidence a better understanding for the law, and a greater concern for achieving just results in criminal proceedings than do other parties who share a similar responsibility. As the Supreme Court explained in *Ake* when it confirmed that the Constitution protects an indigent criminal defendant's right to expert assistance,

[t]he State's interest in prevailing at trial—unlike that of a private litigant—is necessarily tempered by its interest in the fair and accurate adjudication of criminal cases. Thus, also unlike a private litigant, a State may not legitimately assert an interest in maintenance of a strategic advantage over the defense, if the result of that advantage is to cast a

---

**19.** If Minnesota's law enforcement and prosecutorial communities believe that medical examiners are not independent, autonomous, and neutral actors, we now state clearly that

such a belief has no place within Minnesota's criminal justice system.

**20.** See Dr. Thomas's email to Backstrom dated September 16, 2008.

pall on the accuracy of the verdict obtained.

470 U.S. at 79, 105 S.Ct. 1087.

We are mindful of the responsibilities of prosecutors to carry out their executive duties and prosecute those charged with crimes, and we recognize the challenges presented by ethically fulfilling these duties. *See State v. Streiff*, 673 N.W.2d 831, 839 (Minn.2004) (Anderson, Paul H., J., concurring) ("[T]he executive branch's power to charge a criminal offense is awesome and sometimes may be difficult to exercise in a just manner."). But the fact that a medical examiner's testimony in one case may make it more difficult for the State to meet its burden in a later case is an inappropriate reason to impose restrictions on medical examiners. There is possibly no greater danger in our criminal justice system than convicting one who is innocent. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ("It is critical that the moral force of the criminal law not be diluted by a [justice system] that leaves people in doubt whether innocent men are being condemned."). And our concern over convicting an innocent defendant has led us to say that "a prosecutor may not seek a conviction at any price." *Ramey*, 721 N.W.2d at 300 (citing *State v. Porter*, 526 N.W.2d 359, 362–63 (Minn.1995)); *cf. Shorter v. State*, 511 N.W.2d 743, 747 (Minn.1994) (" '[J]ustice must satisfy the appearance of justice.' " (quoting *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954))).

In her dissent, the Chief Justice rejects Beecroft's interests-of-justice claim on the ground that we have typically reversed convictions based on prosecutorial misconduct only after first issuing a warning about the potential consequences for the misbehavior. *See, e.g., Cabrera*, 700 N.W.2d at 475 (reversing conviction when prosecutor injected race into the trial after previous warnings from this court); *Lefthand*, 488 N.W.2d at 801–02 (addressing in-custody interrogation of formally accused person who is represented by counsel). Similarly, the State contends that the interests of justice do not compel reversal because there has been no prior warning to prosecutors not to interfere with the independence of medical examiners.[21]

The reasoning of the Chief's dissent and the State is problematic. By its nature, our power to reverse a conviction in the interests of justice "provides, in effect, a 'safety valve' for the justice system." Henry W. McCarr & Jack S. Nordby, 9 *Minnesota Practice—Criminal Law & Procedure* § 47.57 (3d ed.2001). Although a repeated pattern of prosecutorial misconduct may have been one basis for reversal in the past, we have never imposed a repeated behavior standard as a rigid threshold requirement on our ability to reverse in the interests of justice. Our authority to exercise our supervisory power over district courts must remain flexible based on the circumstances of each individual case. *See, e.g. Porter*, 526 N.W.2d at 366 (reversing conviction based on prosecutorial misconduct resulting in prejudicial error and in the interests of justice). Simply put, the State is not always entitled to a "warning" before it realizes the consequences of violating established laws and rules and interfering with the fair administration of justice.

---

**21.** The State also argues that reversal is not warranted because the facts of this case are not likely to repeat themselves and because our court has already "sen[t] a message" by sanctioning Backstrom. Given the widespread nature of the misperception in the law enforcement and prosecutorial communities on the proper role of medical examiners outlined above, we are not convinced that this is an isolated incident unlikely to be repeated.

There is precedent for reversal in the interests of justice without a prior warning of our disapproval. In *State v. Schwantes,* we reversed the defendant's conviction in the interests of justice based solely on the prosecutor's inadvertent failure to comply with discovery rules. 314 N.W.2d 243, 244–45 (Minn.1982). In *Schwantes,* there was overwhelming evidence of guilt and the discovery violation pertained only to impeachment of a defense witness—nevertheless, we held that the State's failure to turn over a single government file was sufficient to warrant reversal. *Id.* at 245. We explained that, although the expansion of criminal discovery was a "recent" development, a new trial was required to ensure that the "rules adopted by this court are observed by ... the prosecution." *Id.* Here, if anything, the rationale for a reversal is more compelling than it was in *Schwantes.* In *Schwantes,* there was a single, inadvertent violation of a new rule established by our court; here, multiple state actors participated in a widespread, pervasive violation of a statutory and constitutional mandate. Thus, as in *Schwantes,* we conclude that the absence of a warning does not restrict our ability to grant Beecroft a new trial.

Medical examiners must be allowed to complete their death investigations without the interference, or the appearance of interference, by other state actors, including law enforcement officials and prosecutors. Law enforcement officials and prosecutors must respect the independence, autonomy, and neutrality of medical examiners. Law enforcement officials and prosecutors also have a duty to help ensure the vindication of a criminal defendant's constitutional right to the consulting and testimonial assistance of medical examiners. We conclude that given the "exceptional" circumstances of this case, the only way to see that this mandate is fulfilled and to guarantee the "fair administration of justice" is

to reverse Beecroft's conviction in the interests of justice. Therefore, we reverse Beecroft's conviction by the district court and remand for a new trial.

## V.

Because we conclude that Beecroft is entitled to a new trial in the interests of justice, we also need to address Beecroft's contention that the district court erred when it denied her motion to suppress the statement she made to the police at the hospital. Beecroft specifically asserts that (1) the *Miranda* warning was insufficient because she was not informed about the possibility of adult prosecution and (2) she did not voluntarily waive her *Miranda* rights. The State argues that the court properly admitted the statement because Beecroft was not in custody when she made the statement, the *Miranda* warning was adequate, and Beecroft voluntarily waived her *Miranda* rights. It is not necessary for us to reach the custody issue, because even if Beecroft was in custody, we conclude that the *Miranda* warning was adequate and that Beecroft voluntarily waived her rights.

### A. *Adequacy of Miranda Warning*

Turning first to Beecroft's assertion that the *Miranda* warning was inadequate, we have cautioned that there is "a heightened concern" that a juvenile suspect "actually comprehends that [her] statements can be used in adult court." *State v. Fardan,* 773 N.W.2d 303, 313 (Minn.2009). Thus, we have said that "the best course is to specifically warn the minor that [her] statement can be used in adult court, particularly when the juvenile might be misled by the protective, nonadversary environment that juvenile court fosters." *State v. Burrell,* 697 N.W.2d 579, 592 (Minn.2005) (citations omitted) (internal quotations omitted). But "the failure

to give such a warning does not necessarily make a juvenile's *Miranda* warning inadequate. The warning may still be adequate if a juvenile may be imputed with the knowledge of potential adult court prosecution." *Fardan*, 773 N.W.2d at 313 (citation omitted). To determine whether imputation of this knowledge is appropriate, we examine "whether the circumstances regarding the interrogation make it clear that the process is outside the realm of the juvenile court." *Id.*

Our analysis in *Burrell* and *Fardan* is helpful to this examination. In *Burrell*, the juvenile defendant was handcuffed, taken into a police interrogation room, and questioned while his mother was forced to wait outside in the police station lobby. 697 N.W.2d at 592. Before administering a *Miranda* warning, the police told Burrell that they were investigating the shooting of a little girl. *Id.* We concluded that, "[b]ased on the physical restraints used during Burrell's arrest" and conversations indicating that Burrell knew police officers had apprehended him in connection with a murder, "knowledge of possible adult-court prosecution could be imputed to Burrell." *Id.* Similarly, in *Fardan*, we held that the knowledge of adult-court prosecution could be imputed to the juvenile defendant because the police "put Fardan in handcuffs," transported Fardan to "Minneapolis City Hall, which is not a juvenile court setting," presented Fardan with a search warrant, "took a DNA swab," "told Fardan that they were investigating incidents" that took place the night of the victim's death, and "did not imply that the interrogation would be confidential or nonadversarial." 773 N.W.2d at 313–14.

■ We conclude that Beecroft also can be imputed with the knowledge of adult-court prosecution. She was nearly 18 years old at the time of the interrogation—17 years and 9 months. Unlike Bur-

rell, Beecroft had her mother present, and it is reasonable to presume Beecroft's mother knew that Beecroft could be charged as an adult, would safeguard Beecroft's rights accordingly, and would—and did—stop the questioning when it became clear that continuing to talk to the police would not be in Beecroft's best interest. Further, in the first interview—the day before the hospital interview—the police asked Beecroft if she had "heard of words on TV like homicide and murder," implicating the potentially serious consequences of waiving her rights. *See Burrell*, 697 N.W.2d at 592. Moreover, the police did not imply that the interrogation would be confidential or nonadversarial. *See Fardan*, 773 N.W.2d at 313. Therefore, even though we conclude that the police should have given a more specific warning, *see Burrell*, 697 N.W.2d at 592, we also conclude Beecroft can be imputed with the knowledge that she could be tried as an adult and we therefore hold that the challenged *Miranda* warning was adequate.

### B. Voluntariness of Waiver

■ Beecroft also asserts that her waiver of her *Miranda* rights was not voluntary. A suspect may waive her *Miranda* rights as long as she does so knowingly, intelligently, and voluntarily. *Burrell*, 697 N.W.2d at 591. A determination that a "statement is involuntary within the meaning of the Due Process Clause of the Fourteenth Amendment necessitates a finding that the statement was coerced." *State v. Thompson*, 788 N.W.2d 485, 492 (Minn.2010). The "key question" under this inquiry is "whether the will of the defendant was overborne, which does not necessarily require threats or intimidating techniques." *Id.* To determine whether a juvenile's waiver was voluntary, we evaluate the totality of the circumstances, con-

sidering such factors as "age, maturity, intelligence, education and prior criminal experience, as well as any physical deprivations during the interrogation, the presence or absence of parents, the length and legality of the detention, the lack of or adequacy of warnings, and the nature of the interrogation." *Id.* at 492–93 (quoting *State v. Jones*, 566 N.W.2d 317, 322–23 (Minn.1997)).

Based on our careful review of the record, we conclude that Beecroft's waiver was voluntary. Beecroft was 3 months from her 18th birthday. She was a senior in high school and worked a part-time job, evidencing a level of education, intelligence, and maturity of someone who is nearly an adult. There is no evidence that she was deprived of any physical comforts during the interview. The interview was relatively short (15 minutes) and it did not take place in a police station or interrogation room. Beecroft had received two *Miranda* warnings within 24 hours. Both warnings were adequate. She spoke freely to the police without any hesitation or apparent pressure from the police to do so. Finally, unlike Burrell, who was repeatedly denied the opportunity to speak with his mother both before and after receiving his *Miranda* warning even though his mother was in an adjoining interrogation room, Beecroft's mother was present when Beecroft waived her rights. *See Burrell*, 697 N.W.2d at 585–86. After considering the totality of the circumstances, we conclude that Beecroft's waiver was voluntary. Therefore, we conclude that the district court did not err when it admitted into evidence the statement Beecroft made to the police at the hospital.

## VI.

In sum, while we conclude that state actors' substantial interference with Beecroft's due process right to present a complete defense constitutes error, under our standard of review, we conclude that any error did not affect Beecroft's substantial rights. Nevertheless, we conclude that because the conduct of multiple state actors unquestionably interfered with the legislatively mandated independence of medical examiners, thereby putting Beecroft's constitutional rights at risk, we exercise our supervisory powers and reverse Beecroft's conviction in the interests of justice. Finally, we conclude that the district court did not err when it admitted the statement Beecroft made to the police when she was at the hospital.

Reversed and remanded.

ANDERSON, G. BARRY, Justice (concurring).

I concur in the result reached by the plurality but arrive at that outcome by a different route. The United States and Minnesota Constitutions guarantee a criminal defendant the right to effective assistance of counsel. *See* U.S. Const. amend. VI; Minn. Const. art. I, § 6; *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Vance*, 254 N.W.2d 353, 358 (Minn.1977). This right, of course, is not a guarantee of perfect, error-free representation. It has been aptly said that "the [right to counsel] guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Isaac*, 456 U.S. 107, 134, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). But when defense counsel fails to identify and object to obvious prosecutorial misconduct or other obvious prejudicial error, and there is no objectively reasonable strategy or tactic explaining counsel's failure to intervene, the fairness of a defendant's trial is cast into doubt. I would conclude that Beecroft did not have effective assistance

of trial counsel and would reverse and remand for a new trial on that basis.

In some respects, this case is an odd candidate for an ineffective assistance of counsel claim. Beecroft's lawyers mounted an aggressive defense, retained expert witnesses, effectively cross-examined the State's witnesses, and otherwise fully participated in the defense of their client's interests. And the unprecedented nature of the state-actor misconduct here likely complicated defense counsel's response to that misconduct.

All of that said, however, I conclude that defense counsel's failure to act to defend Beecroft's substantial and fundamental interest in a fair trial, when faced with government interference with potential defense witnesses and inappropriate third-party contact with the trier of fact, requires reversal and a remand for a new trial. Because I conclude that defense counsel's failure to act was objectively unreasonable and Beecroft was prejudiced by defense counsel's inaction, I concur in the plurality's decision to reverse Beecroft's conviction and remand for a new trial.

## I.

The plurality's opinion contains a thorough factual summary, but I briefly highlight two events from Beecroft's trial that are essential to my conclusion that Beecroft did not receive effective assistance of counsel.

### Interference with Dr. Susan Roe

During the early stages of Beecroft's trial, forensic pathologist Dr. Susan Roe worked as a consulting expert for Beecroft's defense. Beecroft had also listed Dr. Roe as a potential expert witness to testify on Beecroft's behalf. In a series of emails sent before and during Beecroft's trial by Dakota County Attorney James Backstrom to Dr. Roe's supervisor, Dr. Lindsey Thomas (the "Backstrom–Thomas emails"), Backstrom conveyed his belief that Dr. Roe's consultation with and testimony on behalf of criminal defendants constituted a "conflict of interest." Backstrom further threatened to remove his support for Dr. Thomas's appointment as the Dakota County Medical Examiner based on his view that Dr. Thomas and her employees should not work with criminal defendants.

According to Beecroft's counsel, the Backstrom–Thomas emails had a "chilling effect" on Dr. Roe's participation in the case. Based on the content of the emails, and in the interest of her own financial self-preservation, Dr. Roe told defense counsel that she wanted no further involvement in Beecroft's case. Yet, after first learning of the Backstrom–Thomas emails, Beecroft's counsel did little more than bring the emails to the court's attention. Then, after Dr. Roe withdrew from any continued participation in the case, Beecroft's counsel again took no action other than reporting to the court that Dr. Roe had completely severed her "ties and communication" with the defense, and requesting that the court make the emails part of the official trial record.

### Third-party Contact with District Court

Backstrom apparently learned that Beecroft's counsel had reported the Backstrom–Thomas emails to the court. In response, Backstrom sent an email to the district court, in this case sitting without a jury (the "Backstrom-court email"). The Backstrom-court email specifically referenced Beecroft's ongoing trial and Dr. Roe's participation in that trial.

The following day, Beecroft's counsel made a motion to the district court regarding the Backstrom-court email. After the close of evidence that day, the court discussed the email and defense counsel's motion with State prosecutors and defense

counsel. Defense counsel explained to the court that they intentionally left their motion "somewhat vague" because they were unsure "what, if any relief [they] were seeking."[1] "[S]omewhat vague" is a generous description. The motion was wholly silent as to a description of the objectionable actions by Backstrom, the effect of those actions on the defense, and any discussion about a possible remedy for these wrongful actions. Rather, and inexplicably, defense counsel left it to the court to "suggest[ ]" possible remedies. Responding to defense counsel's motion, the district court identified the Backstrom-court email as an "inappropriate communication," and explained that although it "has nothing to do with the evidence ... in th[e] case," the email made the court's fair consideration of the evidence "difficult." The court also made the Backstrom–Thomas emails part of the trial's official record but took no additional action to provide any relief to Beecroft.

## II.

The question presented is whether Beecroft's constitutional right to reasonably effective assistance of counsel was violated.[2] We analyze claims of ineffective assistance of counsel under the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *State v. Rhodes,* 657 N.W.2d 823, 842 (Minn.2003). First, an appellant must demonstrate that her trial counsel's representation "fell below 'an objective standard of reasonableness.'" *Scruggs v. State,* 484 N.W.2d 21, 25 (Minn.1992) (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052). Second, an appellant must demonstrate that "a reasonable probability exists that the outcome would have been different but for counsel's errors." *State v. Lahue,* 585 N.W.2d 785, 789 (Minn.1998). I address each *Strickland* prong in turn.

### A.

This court has long demonstrated a healthy reluctance to second-guess the performance of trial counsel. Thus, to establish that her trial counsel's performance fell below an objective standard of reasonableness, Beecroft must overcome a "strong presumption that counsel's performance was reasonable." *State v. Martin,* 695 N.W.2d 578, 587 (Minn.2005), *overruled on other grounds by Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

When reviewing claims of ineffective assistance of counsel, one area of conduct into which we have been particularly reluctant to venture is "trial strategy." *Lahue,* 585 N.W.2d at 789; *see also, e.g., State v. Jones,* 392 N.W.2d 224, 236 (Minn. 1986) (refusing to review trial "strategy" and "tactics" because an appellate court, "unlike the counsel, has the benefit of

1. Beecroft's motion requested the following relief:
 1. [A]n Order allowing counsel for the Defendant to make a further record on the continuing and inappropriate communications of James Backstrom, Dakota County Attorney, adversely affecting the fair administration of justice in this matter.
 2. [A]n Order directing that the emails of James Backstrom ... be made part of the official record of these proceedings.

 3. [A]n order granting such relief as deemed appropriate by the Defense.
 4. [S]uch other relief as deemed just and proper by this court.

2. The State argues that Beecroft's ineffective-assistance-of-counsel claim is not properly before this court because Beecroft did not raise this claim in her postconviction petition or properly amend her petition to include the claim. But the postconviction court addressed the merits of Beecroft's claim and the parties have briefed the issue.

hindsight"); *State v. Sutton,* 277 Minn. 157, 161, 152 N.W.2d 57, 60 (1967) ("It is not the function of this court to second-guess the trial attorney's choice of trial strategy."). Indeed, we have previously explained that our analysis under *Strickland*'s first prong "generally does not include reviewing attacks on counsel's trial strategy, because trial strategy lies within the discretion of trial counsel." *Schleicher v. State,* 718 N.W.2d 440, 447 (Minn.2006) (citation omitted) (internal quotations omitted).

That is because defense counsel must "have the flexibility to represent a client to the fullest extent possible," *Jones,* 392 N.W.2d at 236, and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Thus, so long as defense counsel's performance preserves a truly adversarial contest between the prosecution and the defendant, we will generally resist the temptation to question the countless tactical decisions that defense counsel must inevitably make during a criminal trial. *See United States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) ("When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred." (footnotes omitted)).

Although our scrutiny of defense attorneys is, and must continue to be, " 'highly deferential,' " *Rhodes,* 657 N.W.2d at 844 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052), our deference has limits. When defense counsel's action—or inaction—cannot be explained by any reasonably conceivable strategy, our customary deference must cede to our duty to protect a defendant's constitutional right to counsel. *See Moore v. Johnson,* 194 F.3d

586, 617 (5th Cir.1999) ("*Strickland* does not require deference when there is no conceivable strategic purpose that would explain counsel's conduct." (citation omitted)). Put differently, deference is unwarranted if an attorney's unreasonable error "was not based on 'strategy' " but was instead the result of a misunderstanding of facts or law or an inexcusable oversight. *Kimmelman v. Morrison,* 477 U.S. 365, 385, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *see also United States v. Hylton,* 294 F.3d 130, 134 (D.C.Cir.2002) (concluding that defense counsel's failure to seek to exclude government witnesses was "simply inexcusable" and resulted from a "misunderstanding of [the law]"); *Loyd v. Whitley,* 977 F.2d 149, 158 (5th Cir.1992) (noting the "crucial distinction between strategic judgment calls and plain omissions").

In this case, after learning that multiple state actors had interfered with a defense consultant and potential defense witness, defense counsel failed to argue that their client's due process rights had been violated. Defense counsel again failed to take any substantial action after a third-party state-actor engaged in inappropriate contact with the trial judge, who was sitting as the fact-finder. Given the facts and circumstances of this case, defense counsel's failures were "simply inexcusable."

After defense counsel first became aware of the Backstrom–Thomas emails, counsel notified the district court of the existence of the emails but took no further action. This is troubling because, by then, defense counsel was already aware of the "chilling effect" of the emails on Dr. Roe, a consulting expert and potential defense witness. The constitutional implications for Beecroft were obvious; state interference with a defense witness could constitute a due process violation and defense counsel should have acted to defend their

client's substantial interest in a fair trial.[3] *See State v. Graham,* 764 N.W.2d 340, 349 (Minn.2009). And, three days later, after Dr. Roe had completely removed herself from further participation in the case, Beecroft's counsel again took what can be fairly described as minimal action: counsel requested that the district court make the Backstrom–Thomas emails part of the trial's official record. Simply put, a forensic expert who had been a defense consultant and a possible defense witness severed ties to the defense in mid-trial based on the conduct of a county attorney and Beecroft's counsel took no substantial action in response.

The failure of Beecroft's counsel to provide reasonably effective assistance to their client is further demonstrated by counsel's response to interference with another possible defense witness—Dr. Janice Ophoven. Dr. Ophoven is a forensic pathologist who, at the request of Dr. Roe, reviewed the medical record in this case. Dr. Ophoven also provided a written report to Dr. Roe in which Dr. Ophoven concluded that there was no evidence, to a reasonable medical certainty, that Beecroft's baby was born alive. Thus, Dr. Ophoven's conclusion directly supported the defense's theory of the case. Yet defense counsel took no action when Dr. Ophoven told them that her contract with the Saint Louis County Medical Examiner prohibited her from testifying on behalf of criminal defendants in Minnesota.

Once again, in the face of possible government interference with a potential defense witness, defense counsel failed to argue that their client's due process rights were violated. When asked why the defense team did not file a motion asserting a violation of their client's right to present a complete defense, counsel replied, "[I]t didn't occur to [us]."

Hence, my conclusion that defense counsel's repeated inaction in this case was objectively unreasonable is not a case of second-guessing trial strategy. The trial record and defense counsel's testimony reveal that counsel had *"no* strategy" to address obvious government misconduct, or "at least no strategy that could pass as anywhere near objectively reasonable." *United States v. Ramsey,* 323 F.Supp.2d 27, 36 (D.D.C.2004).

The facts of this case are unique and few applicable precedents exist. But the lack of precedent is an insufficient excuse for defense counsel's failure to take appropriate action in the face of obvious misconduct by state actors. *Cf. Hodge v. Hurley,* 426 F.3d 368, 377 (6th Cir.2005) (concluding that a failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel); *Mason v. State,* 274 Ga. 79, 548 S.E.2d 298, 301 (2001) (same).

### B.

Even though Beecroft has demonstrated that her counsel's performance fell below an objective standard of reasonableness, she cannot succeed on her claim of ineffective assistance of counsel unless she can also show that she suffered prejudice as a result. Under *Strickland,* an appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. 2052. "A 'reasonable

---

**3.** Beecroft's counsel indicated to the district court that they were aware that Backstrom's emails to Thomas were contrary to Minnesota rules and law. We agreed with that assessment in *In re Backstrom,* in which we held that Backstrom "committed professional mis-

conduct warranting public discipline" when he "threaten[ed] to withdraw support for an official appointed by the county board unless the official barred her subordinates from testifying as defense experts in criminal cases." 767 N.W.2d 453, 453 (Minn.2009)

probability' means 'a probability sufficient to undermine confidence in the outcome.'" *Rhodes*, 657 N.W.2d at 842 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

As a result of state action, Beecroft was deprived of testimony by and/or consultation with two of her chosen experts, Dr. Roe and Dr. Ophoven. For the reasons set out in Part III of the plurality's opinion, reasons that I join here but do not find necessary to repeat, the failure of counsel to secure the testimony of Dr. Roe and Dr. Ophoven, either by subpoena, by motion, or otherwise, may well have been critical to a successful defense such that there is a "reasonable probability" that but for counsel's errors, the results at trial would have been different.

But there is another reason for concluding Beecroft was prejudiced by these actions. The failure of defense counsel to specifically assert a due process challenge on behalf of their client deprived Beecroft of any possibility of a remedy. Those remedies included, but were not limited to, the possibility of a continuance (and, importantly, given that it was a bench trial, perhaps a lengthy continuance) to make other, more satisfactory, arrangements for expert witnesses and, perhaps more directly, an order granting a mistrial.[4] And as to the mistrial remedy, although we have not specifically recognized the failure to make a motion for a mistrial as grounds for a finding of ineffective assistance of counsel, other jurisdictions have done so. *See Ramsey*, 323 F.Supp.2d 27.[5]

There are certainly reasonable arguments to be made, as a matter of tactics, as to what remedy might have best suited Beecroft. And those decisions are, for the most part, insulated from judicial review. But here, where defense counsel did essentially nothing in response to wrongful conduct, and then admitted at the postconviction proceedings that the possibility of a due process violation never "occurred" to the defense team, *any* possibility of relief for Beecroft has been foreclosed.

4. For purposes of this appeal, I need not answer the question whether Backstrom's email to the district court constituted impermissible ex parte contact between a party and the court because the court described the email as "inappropriate," and that alone should have motivated Beecroft's counsel to move for a mistrial. I note, however, that Minnesota Code of Judicial Conduct Rule 2.9 prohibits judges from "consider[ing] ex parte communications ... concerning a pending or impending matter." According to Rule 2.9's official comment, "The proscription against communications concerning a proceeding includes communications with *lawyers*, law teachers, *and other persons who are not participants* in the proceeding." (Emphasis added). This rule increases the likelihood that the court would have awarded a mistrial because Minn. R.Crim. P. 26.03, subd. 14(3) prohibits a judge from presiding over a trial if the judge is disqualified under the Code of Judicial Conduct.

5. In *Ramsey,* a government witness read into evidence the defendant's confession, and defense counsel made no objection because he assumed that the statement was admissible. 323 F.Supp.2d at 32. Additional trial testimony revealed that the defendant had given his custodial confession to government officers *before* government officers had advised him of his *Miranda* rights, and the confession was suppressed. *Id.* at 32–33. Defense counsel failed to request a mistrial even though the jury had heard an inadmissible confession. *Id.* at 36. The court concluded that defense counsel's assistance was ineffective because "there was no reason for [defense counsel] not to ask for a mistrial." *Id.*

In this case, the failure of defense counsel to move the district court for a mistrial is troubling. But the record is insufficiently developed to determine whether that failure was motivated by an objectively reasonable trial strategy or the failure, once again, to take any action to protect the interests of Beecroft. In any case, it is not necessary to resolve that question here given the foreclosure of any possible relief to Beecroft for the due process violations.

The presence of prejudice necessarily depends on the unique facts and circumstances of each case. As the plurality correctly observes, the postconviction court found no prejudice; thus, there is an argument that Beecroft's claim of ineffective assistance of counsel fails the second part of the *Strickland* test. But here, the failure of defense counsel during trial to request any specific relief prevented the issue of Beecroft's due process rights from being squarely placed before the district court. The postconviction court—with the same presiding judge—was then put in the awkward position of determining whether a specific request for relief would have changed the outcome of the bench trial.

But these were no ordinary expert witnesses; in a trial unusually dependent on expert opinion, state action deprived the defense of two potential expert witnesses who had been with the defense from the very early days of this case. It is undisputed that the district court never heard the testimony of either Dr. Roe or Dr. Ophoven, so judging the effect of the doctors' testimony is speculative. At a minimum, Beecroft has demonstrated that Dr. Ophoven would have testified at trial absent the prior restraint by her employer and that her testimony would have been favorable to Beecroft's theory of the case. *Cf. Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir.2002) (noting that in order for an appellant to demonstrate *Strickland* prejudice based on counsel's failure to call a witness, the appellant must show "not only that [the] testimony would have been favorable, but also that the witness would have testified at trial" (alteration in original) (citation omitted)). Further, the postconviction court failed to specifically address any of the other possible remedies that I have mentioned earlier. Therefore, on this record, my confidence in the outcome of Beecroft's trial is sufficiently undermined. Although it is hardly free from

doubt, I conclude that there is a "reasonable probability" that the outcome of Beecroft's trial would have been different if her attorneys had advocated forcefully for district court recognition of the due process violations suffered by Beecroft.

It must be acknowledged that we have only rarely granted a defendant a new trial based on a claim of ineffective assistance of counsel. In *In re Welfare of T.D.F.*, we concluded that we must reverse a defendant's conviction if a district court's denial of a request for a continuance deprives the defendant's counsel of adequate trial preparation. 258 N.W.2d 774, 775 (Minn.1977). We have also held that if defense counsel "admits a defendant's guilt without the defendant's permission or acquiescence, the defendant should be given a new trial." *State v. Wiplinger*, 343 N.W.2d 858, 861 (Minn.1984); *see also State v. Moore*, 458 N.W.2d 90, 95–96 (Minn.1990) (reaching the same result). But the unique facts of this case, the inexplicable inaction of Beecroft's counsel, and the likely resulting prejudice require us to act here to protect Beecroft's right to counsel. Accordingly, I would reverse Beecroft's conviction and grant Beecroft a new trial but would ground that reversal and new trial on the failure of trial counsel to provide effective assistance.

GILDEA, Chief Justice (dissenting).

The plurality reverses the guilty verdict in this case, not because it concludes that there was prejudicial error in the trial, but because the plurality concludes that reversal is in the "interests of justice." In my view, this is not a case where we should resort to our supervisory powers over the administration of justice to reverse. I also disagree with the concurrence that the performance of Beecroft's counsel requires a new trial. I therefore dissent. I would affirm the verdict and the decision of the

postconviction court to deny Beecroft's petition for postconviction relief.

Beecroft raises four issues in this appeal from her conviction and the denial of her petition for postconviction relief. First, the district court improperly admitted the statement she made to the police at the hospital because the police did not give her an adequate *Miranda* warning and because she did not voluntarily waive her *Miranda* rights. Second, the postconviction court erred when it determined that state agents did not substantially interfere with defense experts and that any alleged governmental interference was harmless beyond a reasonable doubt. Third, even if the alleged due process violation was harmless, this court should order a new trial in the interests of justice. Fourth, defense counsel provided her ineffective assistance of counsel. I address each issue in turn after a discussion of the postconviction court's findings and conclusions.

Following conviction, Beecroft filed a petition for postconviction relief, claiming that she was entitled to a new trial because a state actor had violated her right to due process by interfering with her expert witness's decision to consult with the defense and to testify at trial. Specifically, Beecroft argued that Uncini's imposition of the 2007 employment provision precluding Ophoven from testifying in a Minnesota trial as a defense expert substantially interfered with Ophoven's ability to testify for the defense in lieu of Roe. In the alternative, Beecroft argued at the postconviction hearing that if the postconviction court concluded that she failed to preserve her due process claim, she was still entitled to a new trial because defense counsel's failure to preserve the due process claim would constitute ineffective assistance of counsel.

After an evidentiary hearing, the postconviction court issued an order denying Beecroft's petition for postconviction relief. As a threshold issue, the postconviction court found that Beecroft's decision not to call Roe as a trial witness "was primarily a strategic one (e.g., to avoid potential impeachment of her testimony), although the decision was addressed on the record due to inappropriate communication from Dakota County Attorney James Backstrom directed to Dr. Roe's supervisor and to the trial court."

The postconviction court then made the following findings regarding Beecroft's claim that a state agent substantially interfered with Ophoven's decision not to testify at trial. Defense counsel did not intend to call Ophoven as a witness because defense counsel understood that Ophoven did not testify for defendants. Uncini's imposition of the 2007 employment provision precluding Ophoven from testifying in Minnesota as a defense expert was not the product of any threat or pressure by agents of Saint Louis County.[1] Instead, the 2007 employment provision reflected

---

1. In September 2007, various government officials met to discuss their concerns about Ophoven's participation in an unrelated case. Attendees at the meeting included Uncini, Saint Louis County Sheriff Ross Litman, Saint Louis County Attorney Melanie Ford, and two assistant county attorneys. Ophoven did not attend the meeting. The attendees discussed Ophoven's work quality, a mistake Ophoven had made on a different case, "communication issues" between Ophoven and law enforcement officials, provisions in Lake-

land's contract with the County, Ophoven's views on child abuse cases, and "the impact of [Ophoven's] defense work in this area." The postconviction court found Uncini to be credible when he testified at the postconviction hearing that he never felt his contract with Saint Louis County was threatened, that terminating Ophoven was never discussed, and no county official ever requested that Ophoven refrain from performing criminal defense work.

"a private business decision outside his function as medical examiner." Neither Uncini nor anyone else threatened or intimidated Ophoven and she "was not forced off the witness stand or unable to assist Defendant Beecroft as a potential witness because of intimidation."

Based on its factual determination that a state actor did not prevent through intimidation a defense witness's choice to testify at trial, the postconviction court concluded that Beecroft's due process claim failed. The court further concluded that, even if Beecroft had established substantial governmental interference with a defense witness's choice to testify at trial, Beecroft was not entitled to a new trial because the alleged due process violation was harmless beyond a reasonable doubt. The court emphasized that Ophoven's testimony was cumulative and that, "[a]ny testimony by Dr. Ophoven was either provided by another expert or rebutted by an expert called by the State with more experience in relevant areas." The postconviction court further emphasized that Ophoven would not have been a "critical witness" to the defense and that at the postconviction hearing Ophoven exaggerated her experience and "displayed an inability to remain professional on the stand."

The postconviction court also rejected Beecroft's ineffective assistance of counsel claim. The court explained that Beecroft failed to demonstrate that defense counsel's conduct fell below an objective standard of reasonableness because the evidence produced at the postconviction hearing did not support a finding that a state actor substantially interfered with a defense witness's choice to testify at trial.

With these findings and conclusions in mind, I turn to an analysis of the issues Beecroft raises. Concluding that the record supports the lower court decisions and that this is not a case where we must resort to our supervisory powers to reverse Beecroft's conviction in the interests of justice, I would affirm.

I.

Beecroft's first contention is that she is entitled to a new trial because the district court erred when it denied her motion to suppress the statement she made to the police at the hospital. I agree with the plurality's conclusions that the *Miranda* warning Beecroft received was sufficient and that Beecroft voluntarily waived her *Miranda* rights. I therefore would hold that Beecroft is not entitled to a new trial based on the district court's admission of the statement she made to the police at the hospital.

II.

Beecroft's second contention is that she is entitled to a new trial based on her assertion that government officials, who were not involved in the police investigation or prosecution, violated her right to due process by substantially interfering with her expert witnesses. Because the record supports the postconviction court's determination that the alleged governmental interference with defense witnesses was neither substantial nor harmful, I conclude that the court properly denied Beecroft's petition for postconviction relief.

The Minnesota Constitution guarantees that "[n]o person shall be held to answer for a criminal offense without due process of law." Minn. Const. art. I, § 7. The same protections are afforded under the Fourteenth Amendment of the United States Constitution. *McCollum v. State*, 640 N.W.2d 610, 617–18 (Minn.2002) (citing U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 7). These protections "are triggered only by state action." *State v. Wicklund*, 589 N.W.2d 793, 801 (Minn. 1999). Due process guarantees a criminal

defendant the right to be treated with fundamental fairness and be " 'afforded a meaningful opportunity to present a complete defense.' " *State v. Richards*, 495 N.W.2d 187, 191 (Minn.1992) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). The right to present a complete defense allows a defendant to present her version of the facts to the fact-finder " 'so it may decide where the truth lies.' " *State v. Graham*, 764 N.W.2d 340, 349 (Minn.2009) (quoting *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). This due process protection specifically encompasses "the right to call witnesses." *Id.*

Conduct by government agents that dissuades a potential witness from testifying may violate a defendant's right to due process. *See Graham*, 764 N.W.2d at 349; *see also Lambert v. Blackwell*, 387 F.3d 210, 260 (3d Cir.2004). To establish a due process violation, the government's conduct must "substantially interfere[ ]" with the witness's choice to testify. *Lambert*, 387 F.3d at 260; *accord Graham*, 764 N.W.2d at 349. Substantial interference can occur when, for example, a "government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." *United States v. Serrano*, 406 F.3d 1208, 1216 (10th Cir.2005).

Whether substantial government interference occurred is an " 'extremely fact specific' " question, *Graham*, 764 N.W.2d at 350 (quoting *United States v. Vavages*, 151 F.3d 1185, 1190 (9th Cir.1998)), which appellate courts review for clear error, *Lambert*, 387 F.3d at 260; *United States v. True*, 179 F.3d 1087, 1090 (8th Cir.1999).

Under the clear error standard, the lower court's factual finding will stand unless, on the entire record, "we are left with the definite and firm conviction that a mistake occurred." *State v. Andersen*, 784 N.W.2d 320, 334 (Minn.2010). If we find reasonable evidence to support the lower court's factual finding, we will not disturb the finding. *State v. Evans*, 756 N.W.2d 854, 870 (Minn.2008).

In addition, a determination that substantial governmental interference occurred does not automatically require a new trial. *Peeler v. Wyrick*, 734 F.2d 378, 381–82 (8th Cir.1984). If the court concludes that the substantial governmental interference was harmless beyond a reasonable doubt, a new trial is not required. *Id.* at 382; *see also State v. Richardson*, 670 N.W.2d 267, 277 (Minn.2003) (explaining that the harmless error standard controls the court's review of alleged violations of defendant's due process right to present a defense).

I begin my analysis of Beecroft's due process claims by considering whether the record supports the postconviction court's determinations regarding the existence of substantial governmental interference with Roe and Ophoven's testimony. I then consider whether the alleged governmental interference was harmless beyond a reasonable doubt.[2]

### A.

I turn first to Beecroft's assertion that the conflict-of-interest debate between Backstrom and Thomas substantially interfered with Roe's decision about whether to testify at trial, thereby violating Beecroft's due process right to present a defense. Although Beecroft did not express-

---

2. The State asserts that we should apply a plain error analysis because Beecroft did not make a specific due process objection at trial. But because Beecroft's claim fails under the harmless error standard, it is not necessary for me to reach the question of whether it also fails under a plain error analysis.

ly raise this due process claim below, the postconviction court implicitly rejected the claim when the court made the threshold finding of fact that Beecroft's decision not to call Roe as a trial witness "was primarily a strategic one" designed "to avoid potential impeachment of her testimony." [3]

After reviewing the entire record, I am not left with a definite and firm conviction that the postconviction court made a mistake when the court implicitly found that Backstrom did not substantially interfere with Roe's testimony. The record demonstrates that it was Beecroft's counsel's strategic decision not to call Roe that created Roe's unavailability. The strategic nature of Beecroft's decision not to call Roe as a witness is evidenced by four facts.

First, Beecroft's counsel expressly stated that the defense would "not in any way suggest" that Backstrom's communications were the only reason that Beecroft chose not to call Roe as a witness. Second, Roe's equivocal opinion on the cause of death limited her usefulness as a defense expert. Third, the prosecutor intended to impeach Roe with her prior autopsy reports and her prior inconsistent testimony as a State's witness in a case in Wisconsin. Fourth, defense counsel's decision not to call Roe as a witness, after receiving Backstrom's clarifying e-mail (expressly stating that he did not intend to interfere with Roe's decision about whether to testify in

Beecroft's trial), indicates that Backstrom's e-mails did not substantially interfere with Roe's decision not to testify. Because the record supports a finding that the conflict-of-interest debate between Backstrom and Thomas did not "substantially" interfere with Roe's decision not to testify at trial, I conclude that Backstrom did not violate Beecroft's right to due process.[4]

### B.

I next turn to Beecroft's assertion that Uncini's request that Ophoven "perform no criminal defense work in the State of Minnesota" substantially interfered with Ophoven's decision not to testify at trial, thereby violating Beecroft's due process right to present a defense.

The postconviction court rejected Beecroft's due process claim relating to the alleged interference with Ophoven. The court explained that there was no due process violation because Uncini was not a "state actor," there was no error because there "was no governmental intimidation of . . . Ophoven," and there was no prejudice because Ophoven's testimony would not have been helpful. It is not necessary for me to determine whether Uncini was a state actor because even assuming he was, the record supports the postconviction court's factual finding that there was no substantial governmental interference with

---

**3.** The same judge presided over the court trial and postconviction proceedings.

**4.** Citing *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), Beecroft claims Backstrom's emails violated her due process right to have the assistance of experts in the preparation of her defense. But, unlike Ake, Beecroft *was* provided expert consulting services throughout trial. Beecroft had the benefit of Roe's expert consulting services for the majority of the trial, and Ophoven provided consulting services when Roe stepped down. The only time that Beecroft was with-

out expert assistance was during McGee's rebuttal testimony after the defense had completed its case-in-chief. The district court ameliorated this gap in expert assistance by offering Beecroft a transcript of McGee's testimony to allow her new expert to review it. Because Beecroft had "access to the raw materials integral to the building of an effective defense," Roe's withdrawal as a consulting expert did not deprive Beecroft of this due process right. *See Ake*, 470 U.S. at 77, 105 S.Ct. 1087.

Ophoven's decision not to testify at Beecroft's trial.

At the postconviction hearing, Uncini testified that the imposition of the 2007 term of employment, precluding Ophoven from testifying in Minnesota as a defense expert, was not the product of any threat or pressure by agents of Saint Louis County. Uncini also testified that the term of employment did not apply to testimony given under subpoena. Defense counsel conceded that they never subpoenaed Ophoven. Ophoven testified that her earnings as a part-time employee of Uncini were a minor percentage of her total income as a physician. Ophoven also admitted that she never asked Uncini about the possibility of testifying at Beecroft's trial. Because the record supports the postconviction court's finding that there was no substantial governmental interference with Ophoven's decision not to testify at Beecroft's trial, I conclude that Uncini did not violate Beecroft's right to due process.

## C.

Even if the record failed to support the postconviction court's factual findings regarding the existence of substantial governmental interference with Roe and Ophoven's decisions on trial testimony, Beecroft would not be entitled to a new trial because the alleged governmental interference was harmless beyond a reasonable doubt. A violation of a defendant's due process right to present a defense is harmless if the reviewing court is satisfied beyond a reasonable doubt that if the evidence had been admitted and the damaging potential of the evidence fully realized, a reasonable trier of fact would have reached the same verdict. *State v. Post*, 512 N.W.2d 99, 102 (Minn.1994). On the other hand, "if there is a reasonable possibility that the verdict might have been different if the evidence had been admit-

ted, then the erroneous exclusion of the evidence is prejudicial." *Id.*

After reviewing the record in Beecroft's case, I am satisfied beyond a reasonable doubt that if Roe and Ophoven's testimony had been admitted and the damaging potential of their testimony fully realized, a reasonable trier of fact would have reached the same verdict. Beecroft presented two qualified experts who testified to the same ultimate conclusion that Ophoven would have presented and provided more favorable testimony than Roe could have presented. Roe and Ophoven's testimony, therefore, would have been either cumulative or unhelpful. In addition, the postconviction court, which was also the factfinder at trial, found that Ophoven lacked credibility and would have had limited usefulness as a witness.

The strength of the State's case as a whole also supports the conclusion that the verdict would not have been different if Roe or Ophoven had testified. The district court did not need any expert testimony to find that the baby was alive when Beecroft stabbed her. The court could have drawn those inferences against Beecroft on this element of the crime from the fact that Beecroft went to great lengths to hide her pregnancy, lied to the police and her family on several occasions about the baby's birth and death, premeditated and planned the stabbing, stabbed the baby 135 times, never sought help for herself or the baby either before or after giving birth, obtained weapons, admitted twice to seeing the baby move her finger and open her eyes, and disposed of the body and evidence of the birth in the garbage. As the court stated in its verdict findings, "there would be no reason to stab a child that was not born alive." I therefore would hold that even if Beecroft had established a due process violation with respect

to Roe and Ophoven, the violation was harmless beyond a reasonable doubt.

## III.

Beecroft's third contention is that even if the alleged due process violation was harmless beyond a reasonable doubt, we should order a new trial in the interests of justice. The power to reverse prophylactically in the interests of justice "comes from our power to supervise the trial courts." *State v. Salitros,* 499 N.W.2d 815, 820 (Minn.1993). When exercising that power, our focus " 'is not the punishment of society for the misdeeds of the prosecutor.' " *State v. Graham,* 764 N.W.2d 340, 358 (Minn.2009) (quoting *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). Rather, we rely on our supervisory power in order to "avoid[ ] an unfair trial to the accused." *Id.* And we have reserved the use of power based on an interests-of-justice analysis for "exceptional situations." *Gassler v. State,* 787 N.W.2d 575, 586 (Minn.2010). My review of the record convinces me that this is not such a case.

I acknowledge government action in this case that was contrary to established standards of conduct. Specifically, the Office of Lawyers Professional Responsibility found that Backstrom "threaten[ed] to withdraw support for an official appointed by the county board unless the official barred her subordinates from testifying as defense experts in criminal cases" and recommended that he be disciplined pursuant to Minn. R. Prof. Conduct 8.4(d). *In re Backstrom,* 767 N.W.2d 453, 453 (Minn. 2009). Rule 8.4(d) provides that "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." Backstrom admitted that his conduct was contrary to the rules of professional conduct, and he was disciplined for his actions related to

this case. *See Backstrom,* 767 N.W.2d at 453. Thus, Backstrom's conduct implicates the interests of justice.

Further, Minnesota law provides that a "medical examiner is an *independent* official of the county, subject only to appointment, removal, and budgeting by the county board." Minn.Stat. § 390.011 (2010) (emphasis added). This chapter also provides that when requested, a medical examiner may "make physical examinations and tests incident to any matter of a criminal nature under consideration by the district court or county attorney, law enforcement agency, or publicly appointed criminal defense counsel, and shall deliver a copy of a report of such tests and examinations to the person making the request." Minn.Stat. § 390.251 (2010). The legislature has thereby expressed that medical examiners are independent county officials whose services are available to both prosecuting officials and criminal defendants. Accordingly, a prohibition on Ophoven performing any criminal defense work in Minnesota would interfere with Ophoven's independence as a medical examiner and evidence a disregard for the policy expressed in Minnesota statutes.

But this is the first case where we have been presented with an argument that county attorneys are interfering with the independence of medical examiners. Before resorting to our supervisory powers and ordering reversal in the interests of justice, we have typically expressed disapproval of the behavior and warned about the potential remedy for future similar misbehavior. *See, e.g., State v. Merrill,* 428 N.W.2d 361, 373 (Minn.1988) ("We thus specifically warn St. Louis County and prosecutors generally for the last time that we will no longer tolerate the tactics used by the prosecution in closing arguments in this case. The prosecution can expect a reversal if such tactics are used

again."). When those warnings are not heeded, we have reversed convictions. *See State v. Lefthand,* 488 N.W.2d 799, 802 (Minn.1992). And we have done so even without an overt finding that the defendant was prejudiced by the conduct at issue. *See Salitros,* 499 N.W.2d at 820.

We have, however, grounded such interest-of-justice reversals in our concern with the integrity of the judicial process. *See State v. Windish,* 590 N.W.2d 311, 319 (Minn.1999) ("But ultimately the criminal justice system, including judges, prosecutors and defense lawyers, is responsible for the fair administration of justice. And while the wrongs in this case do not reach the level of a constitutional violation, we are convinced that the system did not serve the interests of justice."); *see also Gassler,* 787 N.W.2d at 587 (noting that "[w]e have ... acted in the interests of justice when necessary to protect the integrity of judicial proceedings"). The integrity of the judicial process is undermined when our rules are "skirt[ed]" and our admonitions "disregard[ed]." *Lefthand,* 488 N.W.2d at 802. The process is also undermined when the errors leave us with doubt as to the fairness of the defendant's trial. *See, e.g., State v. Clifton,* 701 N.W.2d 793, 800 (Minn.2005) (declining to exercise supervisory powers when the defendant received a fair trial).

Those concerns do not support reversal here. In this case, because we have not had occasion to pass upon the behavior at issue—alleged interference with the county medical examiner's independence—we cannot say that our rules have been avoided or our warnings ignored. More importantly, careful review of the record establishes, in my view, that Beecroft did, in fact, receive a fair trial. The evidence with which Beecroft now contends the government interfered was in fact placed before the trier of fact through testimony

from other witnesses. The prosecutor who tried this case is not accused of violating the rules, of interfering with Beecroft's presentation of her defense, or of attempting to persuade the trier of fact by improper means. Finally, the evidence of Beecroft's guilt is overwhelming as discussed above. Under these circumstances, reversal of Beecroft's conviction would not serve the interests of justice. *See Gassler,* 787 N.W.2d at 587 ("We have recognized, however, that under certain circumstances the *reversal* of a conviction may seriously affect the fairness, integrity, or public reputation of judicial proceedings.").

### IV.

Finally, I turn to Beecroft's claim that she was deprived of effective assistance of counsel due to her counsel's failure to pursue a claim based on a violation of due process at trial. The Sixth Amendment guarantees a defendant the effective assistance of counsel. *State v. Wright,* 719 N.W.2d 910, 919 (Minn.2006). To prevail on an ineffective assistance of counsel claim, an appellant "must show that (1)[her] counsel's performance fell below an objective standard of reasonableness, and (2) that a reasonable probability exists that, but for [her] counsel's unprofessional errors, the result of the proceedings would have been different." *State v. Yang,* 774 N.W.2d 539, 564–65 (Minn.2009); *see Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ineffective assistance of counsel claims present mixed questions of law and fact that we review de novo. *State v. Rhodes,* 657 N.W.2d 823, 842 (Minn.2003).

It is not necessary for me to reach the first prong of the *Strickland* analysis because, even if counsel's performance was defective under this prong, Beecroft's claim would fail under the second prong, the prejudice part of the analysis. *See*

*Yang,* 774 N.W.2d at 565. Under the prejudice part of the analysis, a defendant must show there is a reasonable probability that, but for her counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. For example, we have held that an error by counsel, which caused the exclusion of an alibi witness, was not prejudicial when the "testimony would have been cumulative and covered a time frame hours before the murders." *Patterson v. State,* 670 N.W.2d 439, 442 (Minn.2003). As illustrated in *Patterson,* the prejudice prong requires that the defendant "show that counsel's errors 'actually' had an adverse effect in that but for the errors the result of the proceeding probably would have been different." *Gates v. State,* 398 N.W.2d 558, 562 (Minn.1987). This "analysis of prejudice must be made in the context of the totality of the evidence before the factfinder." *Id.* at 563.

Beecroft asserts that if counsel "had prevailed on a motion asserting she was deprived of the right to present a defense, she would have had the benefit of Roe's and Ophoven's testimony," which in turn would have created a reasonable probability of a different verdict. I disagree.

As discussed above, Beecroft presented favorable expert testimony through other witnesses. Roe and Ophoven's testimony, as a result, would have been cumulative. In addition, like the alibi witness in *Patterson,* 670 N.W.2d at 442, the probative value of the expert testimony at issue would not have been sufficiently great so as to create the probability that the trial's outcome would have been different. With respect to Roe, she stated in her expert report that she was not certain whether Beecroft's baby was born alive or stillborn.

Moreover, the State would have impeached Roe with the transcript of her testimony as a State's witness in a Wisconsin case and several of her prior autopsy reports, all of which expressed opinions that were inconsistent with her opinions in Beecroft's case. With regard to Ophoven, this case presents the rather unique situation in which the district court judge who presided over and acted as the fact-finder in Beecroft's court trial later heard and evaluated Ophoven's expert testimony at the postconviction hearing. The judge specifically found that

> Ophoven would not have been a critical witness to the defense; she lacked experience in comparison to the other experts, her opinions were presented at trial by other defense experts, and during her testimony at the post-conviction hearing she had a tendency to over exaggerate her experience and she displayed an inability to remain professional on the stand.

Finally, the court did not need any expert testimony to determine that Beecroft caused the death of her baby because of the strength of the State's case as a whole including Beecroft's own admissions that the baby moved her finger and opened her eyes before Beecroft stabbed her.

Based on my review of the record in this case, I conclude that Beecroft has failed to show that there is a reasonable probability that, but for her counsel's alleged unprofessional errors, the outcome of the proceedings would have been different in her case. I therefore would hold that Beecroft's ineffective assistance of counsel claim fails.

DIETZEN, Justice (dissenting).

I join in the dissent of Chief Justice Gildea.

STRAS, Justice (dissenting).

I join all but part III of the Chief Justice's dissent. I agree with the Chief Justice that state action did not deprive Beecroft of her constitutional right to present a complete defense. I also agree that, even if there was error, the error was harmless.

However, I write separately to address the plurality's conclusion that we should use our supervisory power to reverse prophylactically in the "interests of justice." The facts of this case do not implicate our supervisory power because there is neither error nor prejudice present in this case, one or the other of which is necessary under our case law to invoke the interests of justice as a basis for reversal. *See, e.g., Shorter v. State,* 511 N.W.2d 743, 747 (Minn.1994); *State v. Salitros,* 499 N.W.2d 815, 819–20 (Minn.1993). In the absence of error and prejudice, a reversal frustrates the interests of justice by creating an appearance that we are arbitrarily selecting a particular defendant for relief, even if there has been *no* effect on the constitutional rights of the defendant or the fairness of her trial. *See Gassler v. State,* 787 N.W.2d 575, 587 (Minn.2010) ("[U]nder certain circumstances, the *reversal* of a conviction may seriously affect the fairness, integrity, or public reputation of judicial proceedings.").

More broadly, however, the court's reversal in this case raises legitimate questions about our authority to reverse prophylactically in the interests of justice. To be sure, we have recognized such authority in "exceptional situations" in the past. *Id.* at 586. But I can find no basis in either the United States or Minnesota Constitutions for the power to prophylactically reverse a conviction in the interests of justice. And although our explanations vary, we apparently invoke the "interests of justice" under our inherent "supervisory power," which allows us to direct a disposition when we are particularly offended or outraged by the conduct of one or more of the parties in a case, even if the governing constitutional principles or statutory requirements do not require a reversal.

The response, of course, is that surely there is some standard, or at least relevant indicia, of when it is appropriate to direct a prophylactic reversal in the interests of justice. However, I have failed to find any controlling legal principles in our case law that provide guidance for when it is, and is not, appropriate to invoke the interests of justice. In some cases, we invoke the interests of justice when we find error but no prejudice. *See, e.g., State v. Hunt,* 615 N.W.2d 294, 299 n. 6 (Minn.2000) ("[W]e have ... granted a new trial in the interests of justice without a showing of prejudice."); *State v. Kaiser,* 486 N.W.2d 384, 387 (Minn.1992) (" '[A]lthough the evidence of defendant's guilt was strong, we conclude that a new trial is required in the interests of justice.' " (quoting *State v. Schwantes,* 314 N.W.2d 243, 245 (Minn. 1982))). In others, we prophylactically reverse when there is no error, but the objectionable circumstances prejudiced the defendant. *State v. Windish,* 590 N.W.2d 311, 319 (Minn.1999) (finding no error but concluding that the prevalence of procedural irregularities "suggest[ed] harm" to the defendant's case). Likewise, in some circumstances, we have required the issuance of a warning from this court *before* reversing a conviction in the interests of justice. *See State v. Merrill,* 428 N.W.2d 361, 373 (Minn.1988). In others, we have exercised our power to reverse in the interests of justice despite the absence of a warning. *See Schwantes,* 314 N.W.2d at 244.

Consequently, a leading treatise on Minnesota law accurately describes the power to reverse in the interests of justice as applying in a "very broad" kaleidoscope

of circumstances and concludes that the standard for invoking the power cannot be "precisely described" or "defined." Henry W. McCarr & Jack S. Nordby, 9 *Minnesota Practice—Criminal Law & Procedure* § 47.57 (3d ed.2001). As far as I can tell, there is no unifying or coherent standard defining the limits, if any, of our power to reverse prophylactically in the interests of justice. In one of the more helpful articulations of the power, we stated that we will reverse when "we are troubled by the unavoidable conclusion that justice [has] not [been] served." *Windish*, 590 N.W.2d at 319. But that articulation largely begs the question. How troubled must we be? Must we be unanimously troubled? My point is that it is difficult to understand, much less apply, a standard that turns on our sense of how "troubled" we are about the particular conduct or circumstances in a given case. *Cf. Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 861, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (Scalia, J., concurring) (disparaging the "shocks-the-conscience" test for substantive due-process claims as the "Cellophane of subjectivity").

Ultimately, I need not conclusively resolve the continued viability of our highly subjective interests-of-justice jurisprudence. Whatever the scope of the power to reverse in the interests of justice, it is sufficient to conclude that applying it here, in which I conclude neither error nor prejudice has been established, would impermissibly expand the scope of the power beyond its recognized bounds in our case law. I therefore respectfully dissent.